## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

---

| | |
|---|---|
| HERNAN MATAMOROS, SHARON SAM CHAN, and KATE PETERSEN, on behalf of themselves and all others similarly situated, )<br><br>Plaintiffs, )<br><br>v. )<br><br>STARBUCKS CORPORATION, )<br><br>Defendant. ) | Civil Action No. 08-10772-NMG |

---

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
## AND MEMORANDUM IN SUPPORT THEREOF

The facts in this case are not in dispute. As it concedes through its own written policies and the testimony of its Rule 30(b)(6) deponent, Defendant Starbucks Corporation ("Starbucks") allows its "shift supervisors" to participate in employee tip pools throughout its stores nationwide, including in Massachusetts. Although this practice may be permissible in most parts of the country, it is not legal in Massachusetts. This is because the current version of the Massachusetts Tips Law, Mass. Gen. L. c. 149 § 152A, makes unmistakably clear that employees with **any** managerial responsibilities whatsoever cannot participate in waitstaff tip pools. Although Starbucks will certainly argue that its shift supervisors have only **limited** managerial responsibilities, the plain language of the statute is clear on its face that only employees with **no** managerial responsibilities may now share in waitstaff tip pools.[1] In fact, the Massachusetts Attorney General's office, which is given substantial deference by the

---

[1] As discussed in more detail below, this bright-line test was adopted in 2004 when the Massachusetts Legislature amended the Tips Law, thereby eliminating previous ambiguity concerning which types of employees were permitted to participate in tip pools.

Massachusetts Supreme Judicial Court in its interpretation of the state's wage laws, has issued an advisory expressly stating that the current version of the Tips Law prohibits employers from allowing "shift supervisors" to participate in tip pools.

Starbucks will undoubtedly make every argument imaginable to try to persuade the Court not to apply the law as it is written, but there is no escaping the clear language of this statute.  As shown below, the undisputed evidence in this case shows that Starbucks' shift supervisors do in fact have some managerial responsibilities, including supervising baristas, assigning them to their posts, opening and closing stores, handling and accounting for cash, and running the store in the absence of an assistant manager or general manager.  Given these undisputed facts (as confirmed by Starbucks written policies and the testimony of its Rule 30(b)(6) deponent), the Court must grant Plaintiffs' their motion for summary judgment on their claim that Starbucks has violated the Massachusetts Tips Law by allowing shift supervisors to participate in its stores' tip pools.  The only remaining issue for trial would thus be the calculation of damages for the plaintiff baristas.

## STATEMENT OF MATERIAL FACTS[2]

Starbucks is an international coffee shop chain that owns and operates more than 150 stores in Massachusetts.  Fact Statement at ¶ 2.  These stores are staffed by employees, referred to as "partners," who work as baristas, shift supervisors, assistant managers, or general managers.  Id. at ¶ 3.  Baristas at all of Starbucks' stores pool their tips on a weekly basis, and pursuant to Starbucks' policy, shift supervisors participate with baristas in these tip pools.  Id. at ¶ 38.

---

[2]      The facts identified in this section are drawn almost entirely from Starbucks' own Rule 30(b)(6) deponent, as well as its written policies and procedures, and are set forth in numbered paragraph form in Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts.  References to that document are made here as "Fact Statement at ¶ ___."

Baristas are primarily responsible for "creat[ing] the Starbucks Experience for [its] customers by providing customers with prompt service, quality beverages and products, and maintaining a clean and comfortable store environment." Id. at ¶ 6.  In other words, the role of baristas is to "serve . . . customers." Id.  In order to fulfill this role, baristas are required to take drink and food orders from customers and to fill those orders by preparing the requested drink or food item.  Id. at ¶ 7.  Baristas also process customers' payments at the store cash registers, stock products, and clean the store.  Id.  No prior experience is necessary to work as a barista.  Id. at ¶ 8.  Shift supervisors are promoted from the ranks of Starbucks baristas and must possess some prior retail or food service experience, including the ability to direct the work of others, and are paid at a set hourly rate that is indexed to be higher than that of the baristas.  Id. at ¶¶ 10-19.  Shift supervisors perform the same tasks as those described above for baristas, but in addition, shift supervisors are charged with a number of managerial responsibilities.  Most notably, shift supervisors are responsible for "running the shift." Deposition of Rule 30(b)(6) deponent Sarah Rogers, Partner Resources Director, Tr. 83:10-24, attached as "Exhibit 5" to Fact Statement.  "Running the shift" includes:

- "Deploying" baristas during particular shifts, e.g., instructing baristas on what their "duties [are], whether it [is] to work at the bar or the register or take the trash . . . " Id. at ¶¶ 18, 23(a).

- Coordinating break schedules during shifts and ensuring that baristas take breaks in accordance with store rules and state law.  Id. at ¶ 23(b).

- Handling and accounting for cash, e.g., changing out the tills in the cash registers; accessing the store's safe to make change; collecting deposit slips and placing those slips in the store's safe; bringing deposit slips to and from the bank.  Id. at ¶ 23(c).

- Opening and closing the store in accordance with Starbucks' security procedures.  Id. at ¶ 23(d).

- Arranging for coverage when a barista cannot come into work due, for example, to illness.  Id. at ¶ 23(e).

- Sending baristas home if business is slow and fewer baristas than are present are required. Id. at ¶ 23(c).

- Coordinating and directing the "flow" of customers in a store. Unlike baristas, shift supervisors must "keep an eye on how things are going outside of just the tasks – tasks they are completing." Id. at ¶ 23(f).

- Handling customer complaints. Id. at ¶ 23(i).

- Voiding transactions on the cash registers, such as when a barista enters a drink order incorrectly. "Voids" require a special code which shift supervisors possess, but baristas do not. Id. at ¶ 23(j).

These and other responsibilities are set forth in the job description for shift supervisors, which provides that shift supervisors must "[p]rovide[] feedback to store manager on partner performance during shift," "[c]ontribute[] to positive team environment by recognizing alarms or changes in partner morale and performance and communicating them to the store manager," "[c]reate[] a positive learning environment by providing clear, specific, timely and respectful coaching and feedback to partners," "[d]evelop[] positive relationships with shift team by understanding and addressing individual motivation, needs and concerns," "[o]rganize[] opening and closing duties as assigned," "ensure[] proper cash management practices are followed by shift team," and "[f]ollow[] up with baristas during the shift to ensure the delivery of legendary customer service for all customers." Id. at ¶ 24.

Unlike baristas, shift supervisors have either a key or a pass code which allows them to access the store's safe. Id. at ¶ 23(c). Also unlike baristas, shift supervisors possess keys to the store and are able to disarm the store's alarm system. Id. at ¶ 23(d). Shift supervisors will, in addition, help order products and inventory, and have authority to verbally reprimand or "correct" baristas if they observe the barista making a mistake or behaving inappropriately. Id. at ¶ 23(g). In addition, Starbucks requires that at least one managerial employee be at its

4

stores at all times.  Id. at ¶ 28.  Shift supervisors qualify as such managerial employees,

meaning that they may "stand in" for an assistant manager or general manager if neither were

present at the store.  Id. at ¶ 20.  Thus, for example, shift supervisors would handle customer

complaints and open the store's safe to get the cash register tills in the absence of a store

manager or assistant manager.  Id. at ¶ 21.

## STANDARD OF REVIEW

Summary judgment is proper where "there is no genuine issue as to any material fact

and [where] the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

Summary judgment is appropriate where "there is no genuine issues of material fact standing in

the way of the Court's addressing the questions of law raised by both parties," and where the

"dispute is in essence a principled legal conflict."  Sheridan v. International Broth. of Elec.

Workers, Local 455, 940 F. Supp. 368, 374 (D. Mass. 1996).  The Court may grant summary

on liability, but not damages, and instead reserve that issue for trial.  Fed. R. Civ. P. 56(d)(2)

("An interlocutory summary judgment may be rendered on liability alone, even if there is a

genuine issue on the amount of damages"); Andrews v. DuBois, 888 F. Supp. 213, 221 (D.

Mass. 1995) (granting summary judgment on liability; "[a]ny forthcoming trial is limited to the

question of damages").

## ARGUMENT

I.     **STARBUCKS' SHIFT SUPERVISORS, AS EMPLOYEES WITH MANAGERIAL
       RESPONSIBILITY, CANNOT PARTICIPATE IN BARISTA TIP POOLS AS A
       MATTER OF LAW.**

       A.     **The Massachusetts Tips Law precludes employees with _any_ managerial
              responsibility from participating in waitstaff tip pools.**

       As all Massachusetts appellate courts to consider the statute have recognized, the

Massachusetts Tips Law was intended to provide broad protection to workers' wages.  In

Cooney v. Compass Group Foodservice, the Massachusetts Appeals Court observed:  "From first to last, the statute makes plain that payments in the nature of tips or gratuities . . . belong to the employees" and that the statute applies to tips, gratuities, and service charges "in aid of a clear purpose:  letting employees keep these payments."  69 Mass. App. Ct. 632, 637-638 (2007).  Indeed, the Court concluded in Cooney that, in enacting the Tips Law, the Legislature had "devis[ed] a type of 'strict liability' to achieve its goal" of ensuring that employees keep all payments in the nature of tips, gratuities and service charges.  Id. at 638-639; see also Somers v. Converged Access, Inc., 454 Mass. 582, 591 (2009) (wage laws are "strict liability statute[s]").  In DiFiore et al. v. American Airlines, Inc., the Massachusetts Supreme Judicial Court adopted the Appeals Court's reasoning from Cooney, repeatedly noting the expansive scope of the Tips Law to protect certain employees (namely non-managerial service employees), and holding that the statute must be construed by its plain and unequivocal terms, not the policy arguments advanced by either party.  See 454 Mass. 486, 492-496 (2009).

The current version of the Tips Law, enacted in 2004, provides that:

> No employer or person shall cause, require or permit any wait staff employee . . . to participate in a tip pool through which such employee remits any wage, tip or service charge, or any portion thereof, for distribution to any person who is not a wait staff employee.

Mass. Gen. L. ch. 149, § 152A(c).  The term "wait staff employee" is defined as any "person, including a waiter, waitress, bus person, and counter staff, who: (1) serves beverages or prepared food directly to patrons, or who clears patrons' tables; (2) works in a restaurant, banquet facility, or other place where prepared food or beverages are served; *and (3) who has no managerial responsibility*."  Id. at § 152A(a) (emphasis added).  In other words, only wait staff employees may participate in tip pools, but to qualify as a wait staff employee under the Tips Law, the employee cannot possess *any* managerial responsibility.  Thus, under the plain

language of the statute, an employee with even *some* managerial responsibility cannot be said

to have *no* managerial responsibility.  See Bay State Gas Co. v. Local No. 273, Util. Workers

Union, 415 Mass. 72, 75-76 (1993) ("Where the statutory language is clear, the courts must

impart to the language its plain and ordinary meaning"); Cooney, 69 Mass. App. Ct. at 638 (in

construing the Massachusetts Tips Law strictly, in favor of employees, Appeals Court noted that

where "the language of the statute is clear, it is the function of the judiciary to apply it, not

amend it").  The Massachusetts Attorney General's Office, which is given substantial deference

by the courts in its interpretation of Massachusetts wage laws[3], has explained that:

> Workers with *limited* managerial responsibility, such as *shift supervisors*,
> assistant managers, banquet captains and many maitre d's, do not qualify as
> wait staff employees.  Managerial responsibilities can include supervising
> banquet events, making or influencing employment decisions, scheduling shifts
> or work hours of employees, supervising employees and assigning servers to
> their posts.

Attorney General's Advisory on 2004 Amendment to the Tips Law, 2004/03 at 2 (emphasis

added) (attached as "Exhibit 1").[4]

This bright-line test was enacted in 2004, when the Massachusetts Legislature rewrote

the Tips Law to provide clearer guidance as to its protections and prohibitions.  Prior to 2004,

the Massachusetts Tips Law did not define who was, and who was not, eligible to participate in

waitstaff tip pools.  Rather, the pre-2004 Tips Law simply provided in relevant part that:

---

[3]     See DiFiore v. American Airlines, Inc., 454 Mass. 486, 496 n. 11 (2009) (granting "substantial
deference" to Attorney General's Advisory on 2004 Amendment to the Tips Law); Smith, et al. v. Winter Place
LLC d/b/a Locke-Ober Co., Inc., 447 Mass. 363, 367-368 (2006) ("Insofar as the Attorney General's office is the
department charged with enforcing the wage and hour laws, its interpretation of the protections provided
thereunder is entitled to substantial deference").

[4]     In evaluating whether a specific employee possesses managerial responsibility, the Attorney General
also indicated in the Advisory that it "will look to 29 CFR 541.1 (defining the term executive) and relevant law for
interpretive guidance to define the term 'managerial responsibility'."  Ex. 1 at 2 n.3.  That regulation expansively
lists the following duties as managerial: "directing the work of employees," "planning the work," "apportioning the
work among the employees," and "providing for the safety and security of the employees or the property."  29
C.F.R. § 541.102.

> No employer or other person shall solicit, demand, request or accept from any **employee engaged in the serving of food or beverage** any payment of any nature from tips or gratuities received by such employee during the course of his employment . . . .

St. 1983, c. 343 (approved Aug. 5, 1983) (emphasis added).  This somewhat ambiguous language led to a substantial amount of litigation regarding what types of employees could participate in tip pools, and particularly whether employees with managerial duties could participate in these pools.[5]  This ambiguity arose since the pre-2004 version of the law suggested that tip pools were permissible among employees "engaged in the serving of food or beverages" and thus the pertinent question, as determined by the courts, was whether the employees in question served food and beverages as their primary duty, or whether instead their primary duty was managerial.  See cases cited supra in note 5, particularly Boston Harbor Hotel (adopting "primary duty" test), Locke-Ober, and Four Seasons (following "primary duty" test articulated in Boston Harbor Hotel).

This somewhat fuzzy, judicially-created test proved of little help to the food and beverage industry, however, who complained that they did not understand the law or how to comply with it.[6]  As a result, in 2004, the Massachusetts Legislature amended the statute to define specifically who was eligible to participate in a gratuity pool and, in so doing, adopted

---

[5]    Compare Fraser et al v. Pears Co., Inc., 2003 WL 21385384, *1 (Mass. Super. 2003) (under pre-2004 version of Tips Law, maitre d' who had some managerial responsibilities could participate in tip pool since he, like waitstaff, provided service to customers), and Smith et al. v. Winter Place LLC d/b/a Locke-Ober, Suffolk Civ. A. No. 02-01036, at *8-*9 (Mass. Super. 2004) (same), with Fernandez et al v. Four Seasons Hotels, Ltd., 2007 WL 2705723, at *5 (Mass. Super. 2007) (under pre-2004 version of Tips Law, assistant managers and banquet coordinators who assisted waitstaff with serving customers could not participate in gratuity pool since their primary duty was managing); Williamson et al v. DT Mgmt., Inc. d/b/a Boston Harbor Hotel, 2004 WL 1050582, at *11 (Mass. Super. 2004) (catering managers, banquet managers and assistant managers whose primary duties were managerial could not share in proceeds of gratuity pool, despite engaging in direct customer service); Michalak v. Boston Palm Corp., 2004 WL 2915452, at *2-*3 (Mass. Super. 2004) (catering manager could not share in proceeds of gratuity pool where her duties were primarily managerial, although she also served meals and took beverage orders).

[6]    Testimony of Att'y Gen. Tom Reilly in Supp. of Senate Bill 72 (a pre-cursor to 2004 Tips Law amendment), at 2 ("[W]e have talked to the owners and managers of these establishments, and their lawyers, and they have told us that they do not understand the law"), attached as "Exhibit 6."

the current bright-line test that precludes employees with *any* managerial responsibility from participating in waitstaff tip pools.  This amendment was supported by the restaurant and service industry in Massachusetts (including the Massachusetts Restaurant Association), who claimed that the amended statute "clear[ed] up [the] ambiguities that have prompted . . . lawsuits" by "updat[ing] and more clearly defin[ing] who is and who is not a server."  See Franco Ordonez, "Lawsuits Filed By Wait Staff Over Tips", Boston Globe, Oct. 14, 2004, attached as "Exhibit 2".

Since its amendment in 2004, the Tips Law has accomplished precisely what it was intended to do, namely, eliminating ambiguity over what types of employees are permitted to share in tip pools.  As Massachusetts courts have already recognized, the Tips Law now mandates that only wait staff may participate in tip pools, and unequivocally defines "wait staff" to consist *only* of employees with *no* managerial responsibility.  See DePina v. Marriot International, Inc., Suffolk Civ. A. No. 03-05434, at 15 (Mass. Super.  Jul. 28, 2009) (attached as "Exhibit 3") (banquet captains "did not qualify as a 'wait staff employee' under the [amended Tips Law]" because they had "at least some managerial responsibility"); Black v. Cranwell Management Corp., Berkshire Civ. A. No. 07-00122 at 13-14 (Mass. Super. Oct. 21, 2009) (employees with even limited managerial responsibility cannot share in tips; "[t]he [amended] Tips Act is unambiguous and does not distinguish between employees who have many managerial responsibilities and those who have few") (attached as "Exhibit 4").  In those cases, the courts have ruled that employees with even slight or limited managerial responsibilities are now prohibited from sharing in gratuities, even if they themselves directly provide service to customers, even as their primary duty.[7]

---

[7]      Both DePina and Cranwell discuss the history of judicial interpretations of the Tips Law and note the bright-line change to the statute effected by the 2004 amendment, replacing the old "primary duty" test with the

In so clearly delineating between those employees who may participate in tip pools and those who cannot, the Tips Law prevents "dilution" of those tip pools for the employees protected under the law, namely waitstaff employees (who are defined as employees with "no managerial responsibility").  See DiFiore, 454 Mass. at 492 ("[T]he purpose of the revised Act is to 'protect[] the wages and tips of certain employees," namely wait staff and service employees).  By diluting the tip pool for waitstaff, an employer can save on the cost of employing managerial employees.  For better or for worse, and whether or not Starbucks likes it, the Tips Law prohibits employers from saving money this way, by requiring that all compensation for employees with any managerial duties comes from the employer, not from tips left by customers.[8]  Starbucks is certain to argue that Plaintiffs' claim, if successful, would hurt shift supervisors, who provide direct service to customers alongside baristas and so in all "fairness" should be permitted to participate in the tip pool, but the simple answer to this argument is that the statute does not allow it.  If Starbucks is unhappy with this express prohibition in the Massachusetts Tips Law, it could take that complaint to the Legislature, but any argument that the current statute should not be applied as written must be rejected.

In so clearly delineating between those employees who may participate in tip pools and those who cannot, the Tips Law prevents "dilution" of those tip pools for the employees

---

new "no managerial duty" test. See DePina, Ex. 3, at 12-15 (court denied summary judgment to the plaintiffs under pre-2004 Tips Law where dispute of fact existed as to how much managerial authority banquet captains possessed, but granted summary judgment to plaintiffs on same claim under amended Tips Law because "[t]he New Act affords protection only to employees who have 'no managerial authority,'" and the record was "undisputed that at least part of [banquet captains'] job involved supervising the servers during banquets"); Cranwell, Ex. 4 at 12-13 (while "primary duty analysis [was] relevant to claim arising under the earlier version of the Tips Act," the amended Tips Law "expressly limit[s] [its] protection to employees with 'no managerial responsibility,'" which "unequivocally disqualifie[d] fitness instructor who had "slight" managerial responsibility from participating in gratuity tip pool).

[8]     Of course, Plaintiffs do not dispute that employees with managerial responsibility, such as shift supervisors, are entitled to higher compensation as a result of the additional functions that they are obligated to perform.  However, the Tips Law ensures that the costs associated with this increased compensation are not borne by the employer's lowest-paid workers, or by the consumer directly, by prohibiting employees with managerial responsibility from participating in tip pools.

protected under the law, namely waitstaff employees.  See DiFiore, 454 Mass. 486, 492-93

(2009) (intent behind Tips Law was clearly to "protect[] the wages and tips of certain

employees," namely "waitstaff" or "service" employees).  By diluting the tip pool for waitstaff, an

employer can save on the cost of employing managerial employees.  For better or for worse,

the Tips Law prohibits employers from saving money this way.[9]  Starbucks is certain to argue

that Plaintiffs', if successful, will hurt shift supervisors, who work alongside baristas and so in all

"fairness" should be permitted to participate in the tip pool.  But the simple answer to this

argument is that the Tips Law does not allow it.  If Starbucks is unhappy with this express

prohibition in the Tips Law, it could take that complaint to the Legislature, but its argument that

the current statute should not be applied as written must be rejected.  See Cooney, 69 Mass.

App. Ct. at 638 (rejecting defendant's argument that court should "eschew the literal

construction" of the statute; "[w]here 'the language of the statute is clear, it is the function of the

judiciary to apply it, not amend it.'"), quoting Commissioner of Rev. v. Cargill, Inc., 429 Mass.

79, 82 (1999); see also Somers v. Converged Access, Inc., 454 Mass. 582, 592 (2009) (noting

that employers could not avoid the requirements of the wage law by paying its employees a

higher hourly rate, even if that might result in the employee "enjoy[ing] a 'windfall' at the

employer's expense"; "[t]he 'windfall' the Legislature appeared most concerned with is the

'windfall' that employers enjoy from [wage law violations]. . ."), quoting Cooney, 69 Mass. App.

Ct. at 638-39.[10]

---

[9]    Of course, Plaintiffs do not dispute that employees with managerial responsibility, such as shift
supervisors, are entitled to higher compensation as a result of the additional functions that they are obligated to
perform.  However, the Tips Law ensures that the costs associated with this increased compensation are not
borne by the employer's lowest-paid workers, or by the consumer directly, by prohibiting employees with
managerial responsibility from participating in tip pools.

[10]    Moreover, by implementing a bright-line test prohibiting any employee with any managerial
responsibility from sharing in tip pools, the Tips Law serves to establish a "level playing field" so that all
employers know what the rules are and prevents one business from undercutting another business by allowing
its supervisors to be compensated in part from employee tip pools.  See Martin v. Tango's Restaurant, Inc., 969

**B.      Massachusetts courts have determined that employees that had the same types of managerial responsibilities as Starbucks' shift supervisors are prohibited from receiving shares of gratuities as a matter of law.**

In two recent decisions, Massachusetts state courts have affirmed the clear language of the current version of the Tips Law, holding that employees with even slight managerial authority are disqualified from participating in gratuity pools or receiving gratuities.   First, in DePina v. Marriot International, Inc., banquet servers brought suit challenging, among other things, the inclusion of employees known as "banquet captains" in their service charge tip pools.  As with the Starbucks shift supervisors, the banquet captains in DePina performed many of the same tasks as banquet servers, including serving food and beverages to guests, but in addition they also possessed other "broader responsibilities."  Ex. 3 at 2.  For example, banquet captains were required to "communicate[] to each server a particular assignment such as placing china or linens on the tables," and were also responsible for "oversee[ing], direct[ing], and coordinat[ing] various aspects of banquet functions, including the service of food by servers and the timing of the service of each course."  Id.  Banquet captains also "work[ed] the floor during the function," "lead the service team to ensure that everything [went] smoothly," and "coordinat[ed] with the kitchen staff to ensure that special meals are prepared." Id.  Based on these facts, and analyzing the plain language of the Tips Law, the court granted summary judgment for the plaintiffs, ruling that the banquet captains "did not qualify as a 'wait staff employee' under the [Tips Law]" because they had "at least some managerial responsibility."  Id. at 15.[11]  The defendant in DePina argued that its banquet captains did not

_____

F.2d 1319, 1324 (1st Cir. 1992) (strict enforcement of wage laws is "intended to protect complying competitors of [defendant], in addition to making the employee whole").

[11]      The court explained that, under the Tips Law, only "wait staff employees" were permitted to share in tips, and that the statute defined "wait staff employee" as "one who serves beverages or prepared food directly to patrons or clears patrons' tables, and who has no managerial authority."  Id. at 14.  The court relied on the Attorney General's interpretation of the term "no managerial authority," which specifically excluded from "wait

perform many of the functions set forth as examples of managerial authority in 29 C.F.R. § 541, including the ability to influence or control schedules, shifts, or employment decisions. Id. However, noting that the Tips Law precluded employees with "any" managerial responsibilities from sharing in tip pools, the court rejected this argument, finding that it was undisputed that "at least part of [the banquet captains'] job involved supervising the servers." Id.

Next, in Black v. Cranwell Management Corp., spa workers brought suit under the Tips Law seeking to recover the proceeds of a service charge which the defendant collected from customers but did not remit the spa employees. Ex. 4 at 1-2.  The court in that case dismissed on summary judgment one of the named plaintiffs, who worked as a fitness instructor but also performed limited supervisory tasks. Id. at 2, 12.  The court held that this plaintiff could not receive a share of the service charge because she had some managerial responsibility. Id. at 12.  The plaintiff urged the court to reject this argument because her "managerial responsibilities were 'exceedingly slight,'" and because her "primary duties entailed spa services for patrons rather than managerial tasks." Id. at 12.  However, the court rejected this argument, explaining that:

> In the 2004 version of the Tips Act, the Legislature rendered the primary duty analysis moot by expressly limiting the statute's protection to the employees with "no managerial responsibility." ***The Tips Act is unambiguous and does not distinguish between employees who have many managerial responsibilities and those who have few.*** The Court declines to read into the Tips Act words which the Legislature could have, but did not, include.

Id. at 13-14 (emphasis added).  Ultimately the court concluded that the plaintiff's "managerial role at [the defendant's resort] unequivocally disqualifies her as a service employee protected by the Tips Act," and granted summary judgment against her. Id.

---

staff employee" any "[w]orkers with limited managerial responsibility, such as shift supervisors, assistant managers, banquet captains and many maitre d's . . . ." Id.  "In accordance with [this] standard," the court reasoned, "captains at [defendant's] Hotel had managerial responsibility because they supervised banquet events." Id. at 15.

Here, Starbucks' shift supervisors possess at least as much managerial responsibility as the banquet captains in <u>DePina</u> and the dismissed plaintiff in <u>Cranwell</u>.  Indeed, a number of shift supervisors' functions are the same as those identified in <u>DePina</u> and <u>Cranwell</u> as functions which constitute "managerial responsibility."  For example, just as Starbucks' shift supervisors are responsible for "running the shift," the banquet captains in <u>DePina</u> were responsible for "communicat[ing] to each server a particular assignment such as placing china or linens on the tables," and "oversee[ing], direct[ing], and coordinat[ing] various aspects of banquet functions, including the service of food by servers and the timing of the service of each course."  <u>DePina</u>, Ex. 3 at 2.  Similarly, just as Starbucks' shift supervisors are responsible for coordinating baristas' break schedules and arranging for coverage when a barista is absent, the plaintiff in <u>Cranwell</u> was responsible for "scheduling employees' work," and "making sure employees reported to work."  <u>Cranwell</u>, Ex. 4 at 12.

C. **Based on Starbucks' admissions, it is undisputed that shift supervisors are employees with managerial responsibilities.**

The undisputed factual record before the Court, for which Plaintiffs have relied almost completely on Starbucks' own admissions, including its written policies and the testimony of its Rule 30(b)(6) deponent Sarah Rogers, establishes that shift supervisors are employees with some managerial responsibilities (thus disqualifying them from participation in the tip pool). Although shift supervisors work alongside baristas serving customers, shift supervisors have the additional responsibility of "running the shift."  Fact Statement at ¶ 22.  As Ms. Rogers testified, shift supervisors must "keep an eye on how things are going outside of just the tasks – tasks they are completing."  <u>Id.</u> at ¶ 23(h).  Their duties include "deploying" baristas, <u>i.e.</u>, assigning baristas to their stations, be it cash registers or the espresso bar.  <u>Id.</u> at ¶ 23(a). Shift supervisors also "run the shift" by coordinating break schedules "according to state and

14

federal law," so that if a barista wants to take a ten-minute break, he or she would need to communicate that request to her shift supervisor. Id. at ¶ 23(b).  Shift supervisors are, as well, responsible for coordinating and directing the "flow" of customers in a store to prevent confusion and delays. Id. at ¶ 23(h).

In addition to "running the shift," shift supervisors possess a number of other managerial responsibilities as well.  For example, unlike baristas, shift supervisors are responsible for handling and accounting for cash, e.g., changing out the tills in the cash registers; accessing the store's safe to make change; collecting deposit slips and placing those slips in the store's safe; and bringing deposit slips to and from the bank. Id. at ¶ 23(c). Moreover, unlike baristas, shift supervisors are responsible for opening and closing the store.[12] Id. at ¶ 33.  Shift supervisors are also authorized to void transactions on the cash registers, such as when a drink is entered incorrectly. Id. at ¶ 23(j).  Shift supervisors are able to accomplish these functions because they have access to keys and pass codes which the baristas do not have. Id. at ¶¶ 23(c)-(d).

Notably, all of these responsibilities are set forth in Starbucks job description for the shift supervisor position, which explains that shift supervisors must:

- Provide feedback to store managers on partner performance during shift;

- Create a positive learning environment by providing clear, specific, timely and respectful coaching and feedback to partners on shift to ensure operational excellence and to improve partner performance;

- Follow all cash management and cash register policies and ensure proper cash management practices are followed by shift team;

- Follow up with baristas during the shift to ensure the delivery of legendary customer service for all customers; and,

---

[12]        Baristas cannot open or close the store, because they do not, like shift supervisors, have keys to "unlock the door and disarm the alarm." Id. at ¶ 33.

- Utilize operational tools to achieve operational excellence during the shift.

Id. at ¶ 24.[13]

In addition, it is clear that Starbucks itself considers its shift supervisors to constitute a category of employee that is a "step above" baristas in the hierarchy of employee responsibility.[14] For example, shift supervisors are generally promoted from the ranks of baristas.[15] Id. at ¶ 10-11. Unlike baristas, who may be hired with no prior experience, some prior experience working in a "retail or restaurant environment" is necessary to work as a Starbucks shift supervisor, as is the "[a]bility to direct the work of others." Id. at ¶ 13. Once hired or promoted, shift supervisors must enter a training program. Id. at ¶ 16. Part of this training program consists of a workshop on "supervisory skills," which consists of training on deployment, coaching, and "general information on the shift supervisor role." Id. at ¶ 17. Shift supervisors are also given a pay raise when they are promoted and thus are eligible to earn a higher hourly rate of pay than baristas. Id. at ¶ 14. In Massachusetts, new shift supervisors typically earn in the range of $2 to $3 more per hour than new baristas. Id.[16]

---

[13]    As Plaintiff Kate Peterson described it, "there [is] a lot of managing people going on with the shift supervisor role and really that was where the buck stopped on any shift." Id. at ¶ 22.

[14]    Thus, not surprisingly, shift supervisors are expressly called "supervisors" by Starbucks. While Plaintiffs recognize that job titles by themselves are not dispositive, it is telling, and relevant, that the defendant itself used this term to describe these employees. As noted by the Seventh Circuit in Southern Indiana Gas & Electric Co. v. N.L.R.B., an employer "has the right to define jobs within its own hierarchy and, therefore, to grant supervisory status to employees provided that the actual job duties reflect the designation. [Its] designation of the position as supervisory, while not itself determinative, *is certainly a significant factor in ascertaining employee status*." 657 F.2d 878, 886 (7th Cir. 1981) (emphasis added).

[15]    The decision to promote a barista to shift supervisor is always made by either a store manager or a district manager, and typically involves an interview of the candidate. Id. at ¶ 12.

[16]    Notably, other courts have "lumped" shift supervisors together with other managerial personnel such as store managers and assistant managers in other cases involving Starbucks. For example, in Lewis v. Starbucks Corp., the district court noted that "shift supervisors, store managers, and assistant store managers regularly use their personal vehicles to perform work-related duties, and Starbucks does not reimburse those employees for their mileage expenses." 2008 WL 4196690, at *1 (E.D. Cal. 2008). Likewise, in Hedum v. Starbucks Corp., the plaintiff barista injured herself at work and "immediately notified . . . her shift supervisor," of whom she "requested the necessary paperwork to document her injury." 546 F. Supp. 2d 1017, 1021 (D. Or. 2008). In that

As noted earlier, the Attorney General includes in its list of managerial responsibilities "supervising employees and assigning servers to their posts." Ex. 1 at 2. Also, in referencing 29 C.F.R. § 541.1, the Attorney General includes "directing the work of employees," "apportioning the work among employees" and "providing for the safety and security of the employees or the property" as examples of managers responsibilities. Id. at 2 n.3. Here, the undisputed record demonstrates that shift supervisors are responsible for scheduling baristas' breaks, arranging for coverage when a barista is unable to work, assigning baristas to their posts during each shift, directing the flow of customers, handling and accounting for cash throughout the shift and at the end of the shift, arranging for coverage if a barista is unavailable to work, and opening and closing the store in compliance with Starbucks' security procedures. These duties comport precisely with both the facts of DePina and Cranwell, as well as the Attorney General's interpretation of the Tips Law. Thus, there can be no dispute that shift supervisors possess managerial responsibilities that bar their participation in Starbucks' tip pools.

## II. THE MASSACHUSETTS TIPS LAW IS A UNIQUELY STRINGENT STATUTE LIMITING WHAT EMPLOYEES CAN PARTICIPATE IN TIP POOLS, AND THUS DECISIONS FROM OTHER STATES HAVE NO BEARING ON STARBUCKS' LIABILITY UNDER MASS. GEN. LAW CHAPTER 149 § 152A.

Plaintiffs anticipate expect that Starbucks will, in opposing this motion for summary judgment, rely heavily on two recent decisions from other states challenging Starbucks' policy of having shift supervisors participate in its stores' tip pools. In those cases, courts in California

---

case, the shift supervisor was also responsible for giving the plaintiff her "seventh corrective notice (her third at [that particular store]) for showing up late to her shift." Id. Finally, in Massey v. Starbucks Corp., the plaintiff, a customer, brought suit against Starbucks based on an assault allegedly committed upon her by a shift supervisor. 2004 WL 1562737, at *1 (S.D.N.Y. 2004). There, the plaintiff ordered a beverage but was told by the store's shift supervisor that "they could not sit down because the store was closing." Id. When the customer protested, the shift supervisor told the barista preparing the plaintiff's beverage to cancel the order and refund the plaintiff's money. Id. The plaintiff demanded to speak with a manager, and was informed by the shift supervisor that she "was the manager." Id.

and New York determined that shift supervisors could lawfully participate in Starbucks' tip pools under the laws of those states.  See Chau v. Starbucks Corp., 174 Cal. App. 4th 688 (Cal. App. 4 Dist. 2009) (applying California Labor Code § 351)[17], and In re Starbucks Employee Gratuity Litig., Civ. A. No. 08-03318 (S.D.N.Y. 2008) ("Barenboim") (applying New York Labor Law § 196-d), attached as "Exhibit 5."[18]  Any such reliance would be misplaced, however, because the New York and California tips laws are written differently from the Massachusetts Tips Law and do not contain the strict, bright-line prohibition found in the Massachusetts law that precludes employees with any managerial responsibility from participating in tip pools.

In contrast to the Massachusetts Tips Law, the California law and New York law more vaguely state that "no employer or agent" may either "collect, take or receive" (in the case of California) or "demand or accept" (in the case of New York) gratuities that are paid or left for employees.  Thus, the analysis under California and New York law focuses on whether the employee in question is an "agent" of the employer, or whether customers have paid or left the gratuities for the employee in question.

In California, in the Chau case, the trial court concluded that Starbucks shift supervisors were indeed the employer's agent and thus determined that they could not participate in the tip pool, and entered judgment in favor of the plaintiffs.  On appeal, the intermediate appellate state court reversed, significantly **not** on the basis that the shift supervisors were not the employer's agent.  Significantly, the appeals court left undisturbed the trial court's conclusion

---

[17]     In Chau, the trial court had ruled in favor of the plaintiff class, determining that shift supervisors could not participate in the tip pools under California law.  The intermediate appeals court, however, reversed this decision, and the California Supreme Court did not grant certiorari in the case to review the decision.  See Chau v. Starbucks Corp., 174 Cal. App. 4th 688 (Cal. App. 4 Dist. 2009), review denied (Sept. 9, 2009).

[18]     The Barenboim decision is a trial court decision that Plaintiffs (represented by the same counsel as Plaintiffs in this case) expect to appeal.

that shift supervisors were Starbucks' agent.  174 Cal. App. 4th at 696-97.  The court reversed

the trial court's ruling instead on its interpretation of the California tips law that managerial

employees (i.e. agents of the employer) could participate in a tip pool under California law if

customers *intended* for them to receive a share of the tips.[19]  Notably, no such interpretation is

permitted, however, under the Massachusetts Tips Law, which strictly limits tip pool

participation to "waitstaff" and "service" employees, who are defined as employees with "no

managerial responsibility."

Under the plain language of the Massachusetts law, it is immaterial that customers may

***intend*** to tip shift supervisors when they place tips in the communal tip jar since, at every turn,

the Massachusetts Tips Law limits its protections solely to employees who have "no managerial

authority".  Indeed, the Tips Law excludes managerial employees even from its definition of

what constitutes a "tip," in that it defines the term "tips" to mean "a sum of money . . . given as

an acknowledgment of any service performed by a ***wait staff employee*** . . . ."  Id. at § 152A(a).

Since, again, all employees with managerial responsibility are, as a matter of law, ***not wait staff***

***employees***, they are excluded from even the definition of what constitutes "tips" under the

statute.  Thus, the California decision in Chau has no bearing on the issue presented here of

Starbucks' liability under the Massachusetts Tips Law.

In New York, in the Barenboim case, the trial court reached a different conclusion.

While not quarreling with the fact that "agents" of the employer cannot participate in tip pools

---

[19]      The court noted that the California tips statute prohibited employers and their agents from taking any
gratuity that is "paid, given to, or *left for* an employee by a patron."  17 Cal. App. 4th at 698 (emphasis added).
Based on this language, the court reasoned that shift supervisors could participate in tip pools, even though they
were "agents" under the statute, because the statute did not prohibit them from sharing "tip proceeds that were
left in a collective tip box for baristas ***and*** shift supervisors."  Id. at 697 (emphasis original).  Significantly, the
California statute states that "***Every gratuity is hereby declared to be the sole property of the employee or***
***employees to whom it was paid, given, or left for.***"  Id. at 691 n.1, quoting Cal. Labor Code § 351 (emphasis
added).  The Massachusetts Tips Law contains no such language.  Rather, the Massachusetts Tips Law
establishes that tip pools are valid only insofar as they shared only among employees with "no managerial
responsibility".  Mass. Gen. L. ch. 149, § 152A(a).

under the New York tips law, the court there determined that Starbucks' shift supervisors did not have enough managerial responsibilities to qualify as "agents" of the employer.[20]   In so determining, the court recognized that shift supervisors "**supervise and coordinate** [b]aristas, open and close the store, and deposit money in the safe, and oversee the store in the absence of a Store Manager or Assistant Store Manager," Ex. 8 at 9 (emphasis added), but concluded that these were not enough to confer "agency" status on the shift supervisors.[21]   These very findings, however, compel the opposite result in this case.  Since, under the Massachusetts Tips Law, employees may participate in tip pools only if they have "**no** managerial responsibility", it makes no difference at all that the court in New York in <u>Barenboim</u> concluded that Starbucks' shift supervisors do not have **enough** managerial responsibilities to qualify as "agents" because they "exercise authority over the creation, terms or conditions of the employment relationship," under a differently written state law.

<u>CONCLUSION</u>

For all the reasons set forth above, based upon the undisputed facts in this case, the Court should grant the Plaintiffs' motion for summary judgment and rule that Starbucks' shift supervisors, as employees with managerial responsibility, are prohibited from participating in Starbucks' tip pools as a matter of law under Mass. Gen. L. ch. 149, § 152A.

---

[20]      The court held that shift supervisors do not possess the "**broad** managerial authority or power to control employees that courts have held to be sufficient to render an employee an **'employer or [employer's] agent'** within the meaning of Section 196-d." <u>Id.</u> at 9 (emphasis added).

[21]      Citing to New York cases, the court concluded that an employee must possess the "capacity to hire, fire or discipline other employees" in order to qualify as an "agent," and that the shift supervisors, lacking this authority, were therefore not agents as defined by the statute.  <u>Id.</u> at 10.  The standard in Massachusetts, however, is entirely different.  While authority to perform those functions would certainly qualify as managerial responsibilities, those functions do not constitute the universe of managerial responsibilities that exclude an employee from sharing tips under the Massachusetts Tips Law.  Rather, the statute is unequivocal: **any** managerial responsibility suffices to exclude an employee from the definition of "wait staff employee" and thereby exclude them from participating in wait staff tip pools.

Respectfully submitted,

HERNAN MATAMOROS, SHARON SAM
CHAN, KATE PETERSEN, on behalf of
themselves and all others similarly situated,

By their attorneys,


 /s/ Shannon Liss-Riordan
Shannon Liss-Riordan, BBO # 640716
Hillary Schwab, BBO # 666029
LICHTEN & LISS-RIORDAN, P.C.
100 Cambridge Street – 20th Floor
Boston, MA 02114
DATED:   March 25, 2010                          (617) 994 – 5800

## CERTIFICATE OF SERVICE

I hereby certify that on March 25, 2010, a copy of this document was served by
electronic filing on all counsel of record.


 /s/ Shannon Liss-Riordan
Shannon Liss-Riordan, Esq.