(58)

COMMONWEALTH OF MASSACHUSETTS

BERKSHIRE, ss.                                        SUPERIOR COURT
                                             CIVIL ACTION NO. 2007-00122

DOREEN BLACK & others[1]

vs.

CRANWELL MANAGEMENT CORP. & others[2]

## MEMORANDUM OF DECISION AND ORDER ON
## CROSS-MOTIONS FOR SUMMARY JUDGMENT AND MOTIONS TO STRIKE

The plaintiffs, one current and three former employees of the spa at Cranwell Resort, on

behalf of all other persons similarly situated,[3] brought this action to recover service charges

allegedly withheld from them by the defendants Cranwell Management Corp., Berkshire-

Cranwell Limited Partnership, C-B Management Corp., Daniel A. Burack, Allen Movsesian,

Peter Burack, and Lew Kiesler (collectively referred to as "Cranwell"). In their amended

complaint, the plaintiffs allege that Cranwell has not paid them the 20% service charges paid by

patrons for spa services in violation of the Tips Act, G.L. c. 149, § 152A (Count I), violations of

the Weekly Payment of Wages Act, G.L. c. 149, § 148 (Count II), breach of contract (Count III),

breach of the covenant of good faith and fair dealing (Count IV), and conversion (Count V).

This matter is before the Court on Cranwell's motion for summary judgment, the

plaintiffs' cross-motion for summary judgment as to liability only, and on Cranwell's two

---

[1]Suzanne Riccio-Major, Aimee Marshall, and Wanda Libardi, individually and on behalf of all other persons similarly situated

[2]Berkshire-Cranwell Limited Partnership, C-B Management Corp., Daniel A. Burack, Allen Movsesian, Peter Burack and Lew Kiesler

[3]To date, the purported class has not been certified.

motions to strike. After a hearing and for the reasons that follow, both of the summary judgment motions are **ALLOWED** in part and **DENIED** in part, and the motions to strike are **DENIED**.

## BACKGROUND

The summary judgment record contains the following facts, which are undisputed unless otherwise noted. The Court reserves certain details for the legal analysis.

Cranwell is a resort which provides a range of luxury services, including spa services. The spa services offered include personal fitness training, massage, and skin, hair and body treatments. The four named plaintiffs have all been spa employees: Doreen Black was employed by Cranwell as a massage therapist from 2002 to April 1, 2004; Wanda Libardi was employed as a supervisor, esthetician and nail technician by Cranwell from May 2002 to August 19, 2003; Aimee Marshall worked as a fitness instructor and a fitness supervisor at Cranwell Resort from March 2002[4] to February of 2007; and Suzanne Riccio-Major has been employed by Cranwell as a massage therapist from the time the spa opened in March of 2002 to date.

Since its spa opened, Cranwell has assessed a 20% service charge for most spa services. Cranwell's brochures and informational materials inform patrons that a 20% gratuity will be added to all service charges. (See Parties' Consolidated Exhibits 26, 27, and 28). The most recent brochure further states that the service charge "will be given to the service personnel." (Parties' Consolidated Exh. 28). Spa employees are required to inform patrons that all gratuities are included in the 20% service charge. Upon inquiry, spa employees explain to patrons that the

---

[4]Although Cranwell actually hired Marshall in September 2001, she did not have contact with patrons until the spa opened in March of 2002.

entire 20% service charge is paid to spa employees. As a result, patrons rarely give additional tips. The plaintiffs deny ever receiving the 20% service charge, while Cranwell insists that it pays all of the service charges it collects to its spa employees as mandated by the Tips Act.

The summary judgment record contains various documents and descriptions about how Cranwell pays its spa employees. First, Cranwell's compensation agreement is set forth in a personnel status sheet completed by the spa manager with each spa employee at the time of her hire and periodically during employment. The personnel status sheets do not mention tips,[5] but indicate that spa employees earn a flat hourly rate plus a commission which is a fixed percentage--ranging between 39-49%[6]--of the retail cost of the spa service performed.[7] The flat hourly rate only applies when spa employees like Riccio-Major are not providing a service to patrons. (Riccio-Major Dep. p. 34).

Riccio-Major and Marshall testified that in 2002, when they were hired, the spa supervisor, Helen Pierce, informed them that they would be paid their designated commission percentage plus tips. (Riccio-Major Dep. pp. 41-42). Several months later, Riccio-Major asked Pierce why she was not receiving the amount of tips collected by Cranwell through the service

---

[5]Consistent with this, in 2002, Cranwell's payroll clerk, Nancy Kelly Bateman, explained to Riccio-Major that her compensation consisted simply of hourly pay plus commissions. Bateman did not mention a service charge, a service incentive, or an incentive/productivity fee. (Riccio-Major's Supplemental Response to Interrogatory 5).

[6]The percentage depends upon each employee's experience, length of employment, and the scope of her skill set.

[7]There are some variations from this. Fitness instructor Aimee Marshall's first personnel status sheet at her hire date in 2002 lists her rate of pay as $8.50 per hour in the weight room, $18 per class, and 45% for a personal training commission. Five months later, she completed another personnel status sheet which identifies her as an athletic supervisor and states her rate of pay as $9 per hour for 7 hours per week and does not mention any commission rate.

Wanda Libardi's personnel status sheet lists both an hourly rate and commission rates (43% for esthetics and 45% for nails) for services performed.

charge. Pierce replied that there had been a misunderstanding when Pierce had promised Riccio-Major the 48% commission plus gratuities, and that the service charges or tips are included in Riccio-Major's 48% commission rate. (Riccio-Major Dep. p. 44).

Beginning in mid-2002 and in this lawsuit, Cranwell has maintained that the payment of the 39% to 49% commission *includes* the spa employees' hourly wage rate, the 20% service charge, and a fluctuating fee for performing a service. Cranwell refers to this latter fluctuating fee variably as a service incentive, a productivity fee, and a bridge.

Cranwell has never provided anything in writing to spa employees stating that the service charge would be included in their commission rate (see Kiesler Dep. p. 211), nor do other compensation documents generated by Cranwell reference the service charge being included in spa employees' pay.[8] Cranwell has not changed its spa service charge policy since it opened in 2002 (see Kiesler Dep. p. 211), despite the enactment of the amended Tips Act which became effective in September of 2004. Cranwell's general manager, Lew Kiesler, first became aware of the Tips Act upon commencement of this action. (Kiesler Dep. p. 50).

On May 20, 2006, Cranwell initiated a rate freeze under which spa employees' compensation did not rise when the patrons' fee rates increased. For example, in 2009, a spa employee such as Riccio-Major would receive 48% of the retail price which was in effect on

---

[8]For example, Cranwell's form entitled "Spa Commissions" lists employees' daily reports of spa services performed. This form does not mention tips or hourly rates, but does list the amount charged for each spa service on the dates they were performed.

Cranwell's biweekly compensation ledger lists information in columns with the following headings: "serv$," hours worked, commission, "retail," and "x grats." (Exh. 15). It shows that on January 1, 2006, Riccio-Major charged $525 for services, that she worked 5 hours (one hour for each of the five patrons), and that her commission for that period was $117. (A 48% commission on $525 of services would be $252. Cranwell deducted the $15 hourly wage for each of the five hours in which Riccio-Major performed a spa service, or $75, from the commission [$252 - $75=$177]). No data appears in the columns for "retail" or "x grats" for Riccio-Major.

4

May 20, 2006, even if the retail price for the same service had risen in the intervening period. (Riccio-Major Dep. p. 70). As explained by Peter Conboy, Cranwell's controller and chief financial officer, the frozen rates paid to spa employees were no longer a percentage of the retail price or base cost of a treatment or service, but instead a flat dollar amount for each spa service regardless of the amounts collected by Cranwell. (See Conboy Dep. pp. 26-33).[9] Cranwell did not issue revised personnel status sheets, but gave each employee a worksheet listing the amount of compensation she would receive for each type of spa service provided. (Conboy Dep. pp. 30-31). One result of the rate freeze is that spa employees' total compensation remained the same regardless of how much the patron paid for a service, but, as Cranwell explains it, the increased 20% service charge would comprise more of the spa employees' total compensation, while the "bridge" or other components of their compensation would decrease.

Both sides cite further evidence of their respective positions about whether Cranwell has paid its spa employees the service charges it collects. The plaintiffs point out that Cranwell's food and beverage employees, in contrast to spa employees, receive a pay statement which identifies service charge proceeds as separate from and in addition to those employees' regular compensation. Spa employees' pay statements do not reference the service charges or other increases to the hourly rate and commissions.

Cranwell has offered conflicting explanations of exactly what happens to the service charges. Luanne Weiskotten, who was Cranwell's director of human resources until 2005,

---

[9] Conboy's descriptions of spa employees' wages following the wage freeze are convoluted and inconsistent. He stated that there are three components to spa employees' wages: "Well, there's basically three components. First there is the hourly wage. There is the commission portion, which is the bridge between the service charge and the full percentage of the retail price." (Conboy Dep. p. 51). Conboy stated that the base (hourly) wage, plus a bridge (which includes the commission in Conboy's explanation), plus the service charge is the total amount of compensation paid to an employee for providing a spa service. (Conboy Dep. p. 51).

testified that when she asked Cranwell's general manager, Lew Kiesler, why spa employees did not receive the service charge added to the cost of spa services, Kiesler "said something to the effect that this was money that Cranwell collected, not to pay the staff, but for various expenses associated with running the spa."

Spa director Kim Rossi once explained in a meeting to spa employees that the service charges make their way back to the employees in the form of hourly pay they make for being at the spa between booked services. (Karis Affidavit and Attached Statement, ¶ 3). As pointed out by Doreen Black, this would mean that the more massages she gave in one day, the less money she would receive in tips for each massage, and if she were so busy doing massages that she did not have any downtime, she would not receive any tips at all. (Black's Responses to First Set of Interrogatories, number 5).

Although Aimee Marshall was told when she was hired that she would receive tips in addition to the 45% commission, she did not believe she was receiving the 20% service charges for her work, and she asked her supervisors about it. Her supervisor and spa director at that time, Helen Pierce, did not answer the question except to say that she (Marshall) should ask the general manager, Lew Kiesler. When Marshall asked Kiesler why she was not being paid the service charges, Kiesler replied that it is already in her pay, but he did not explain further. (Marshall Dep. pp. 45-46).

In defense of its position that it passes on the full amount of the service charges to spa employees, Cranwell primarily relies upon the testimony of Conboy, who states that all of the service charges collected are paid directly to the spa employees and are never counted as income

or revenue by Cranwell.[10]  He explains that service charges are recorded and itemized as "taxes

and tips" on Cranwell's daily accounting reports, that the total amount of service charges

collected at the end of each month appears on Cranwell's monthly general ledger report, and that

at the end of each month, the service charges are passed through in their entirety to the spa

employee payroll account as a credit and used to pay spa employees' compensation.  (See

Conboy Affid. and Conboy Dep. pp. 102, 147).[11]  Conboy explained, "The service charge is

collected and passed at the end of the month in its entirety, because we don't do it on the [bi-

weekly] payroll cycle."  (Conboy Dep. p. 168).  Conboy agreed that the accounting for the

service charges and the cutting of payroll checks are completely separate, and that Cranwell does

not keep track of particular service charges collected for particular spa services provided.

(Conboy Dep. pp. 168, 174).

     Cranwell also submits an affidavit by Judith Singer, the owner of a Florida-based spa

consulting, marketing, and management advisory company which counts Cranwell among its

clients.  Singer states that, based upon her training and experience in the spa industry, it is

common practice to pay employees an hourly rate, a service incentive, and any gratuity collected,

and that these items "may or may not be combined into one percentage or are more commonly

---

[10]Conboy's statement that service charges are not counted as revenue appears to be contradicted by Lew Kiesler and Cranwell's statements, at times, that service charges are included in spa employees' commissions. Kiesler explained that if a patron received a refund because she or he were unhappy with the quality of the service provided, the service provider would not get a commission because "we didn't collect any revenue and commissions are paid on revenue."  (Kiesler Dep. p. 241).

[11]Conboy has explained this in his deposition in several ways.  "I run that account [spa service charge account] at the end of the month and look at all the daily service charges that were collected and that gets passed in its entirety back against the payroll."  (Conboy Dep. p. 147).  "The accounting entry shows the 20% pass-through in its entirety out of the service charge account into their general ledger for their payroll accounts, because when they were paid their payroll was inclusive of the 20%."  (Conboy Dep. p. 161).  "The service charge account is used for commissions . . . ."  (Conboy Dep. p. 165).

presented as a flat dollar amount that the Spa Employee receives when giving a treatment."
Singer opines that Cranwell's practice of paying spa employees "39% to 49% of the retail price of
Spa Services, with the 20% gratuity/service charge paid by Spa Patrons included within that
percentage, is consistent with, although at the high end of, Spa industry standard."[12]  Singer's
affidavit does not address whether this standard complies with the Massachusetts Tips Act.

Cranwell acknowledges that the 20% service charge raises revenue for Cranwell, because
when Cranwell uses service charges to pay a portion of the spa employees' compensation,
Cranwell is able to retain more income.[13]

## DISCUSSION

### I. The Cross-Motions for Summary Judgment

Summary judgment is appropriate where, viewing the evidence in the light most
favorable to the non-moving party, all material facts have been established and the moving party
is entitled to judgment as a matter of law. *Cabot Corp.* v. *AVX Corp.*, 448 Mass. 629, 636-637
(2007); Mass. R. Civ. P. 56(c).  "[T]he moving party must establish that there are no genuine
issues of material fact, and that the nonmoving party has no reasonable expectation of proving an
essential element of its case." *Miller* v. *Mooney*, 431 Mass. 57, 60 (2000).

While the evidence is examined in the light most favorable to the nonmoving party,
*Foster* v. *Group Health, Inc.*, 444 Mass. 668, 672 (2005), "[c]onclusory statements, general

---

[12]At another spa where Riccio-Major gives massages, the employer itemizes her tip, her hourly rate, and her
compensation for being on stand-by. (Riccio-Major Dep. p. 16-17).  She also testified that her compensation per
massage is higher at other spas, but she does not receive the same benefits as are available at Cranwell. (Riccio-
Major Dep. pp. 17-21).

[13]See Consolidated Opposition of the Defendants to Plaintiffs' Cross-Motion for Summary Judgment and
Reply Brief to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, p. 18.

denials, and factual allegations not based on personal knowledge [are] insufficient to avoid

summary judgment." *Cullen Enterprises, Inc.* v. *Massachusetts Prop. Ins. Underwriting Ass'n*,

399 Mass. 886, 890 (1987).  "If the opposing party fails properly to present specific facts

establishing a genuine, triable issue, summary judgment should be granted." *Id.*

### A.  Statutory Claims Under the Tips Act, G.L. c. 149, § 152A (Count I), and the Weekly Payment of Wages Act, G.L. c. 149, § 148 (Count II)

The Tips Act provides in pertinent part, "No such employer or other person shall retain or

distribute in a manner inconsistent with this section any tip or service charge given directly to the

employer or person."  G. L. c. 149, § 152A (b).

> "If an employer or other person submits a bill, invoice or charge to a patron or other
> person that imposes a service charge or tip, the total proceeds of that service charge or tip
> shall be remitted only to the . . . service employees . . . in proportion to the service
> provided by those employees."

G. L. c. 149, § 152A (d).  The Tips Act further mandates that "[a]ny service charge or tip

remitted by a patron or person to an employer shall be paid to the . . . service employee . . . by the

end of the same business day, and in no case later than the time set for timely payment of wages

under section 148."  G. L. c. 149, § 152A (e).

In relevant part, G.L. c. 149, § 148, known as the Weekly Payment of Wages Act,

requires employers to pay employees their compensation owed within six days of the termination

of each pay period.  See G.L. c. 149, § 148.  The Weekly Payment of Wages Act also provides in

relevant part that:

> "An employer, when paying an employee his wage, shall furnish to such employee a
> suitable pay slip, check stub or envelope showing the name of the employer, the name of
> the employee, the day, month, year, number of hours worked, and hourly rate, and the
> amounts of deductions or increases made for that pay period."

G.L. c. 149, § 148. Claims under both the Tips Act and the Weekly Payment of Wages Act must be brought within three years of the time the cause of action accrued. See G.L. c. 149, § 150.[14]

The plaintiffs allege that Cranwell has violated the Tips Act by retaining or distributing the 20% service charge in a manner inconsistent with G.L. c. 149, § 152A, by failing to remit the total proceeds of service charges to the plaintiffs in proportion to the services provided by them, and by failing to remit to employees, on time, the service charges collected. The claims under the Weekly Payment of Wages Act are that Cranwell has not furnished the plaintiffs with pay stubs identifying payment of the service charges and, as under the Tips Act, that Cranwell has failed to remit the service charges to the plaintiffs within the requisite time.

Several of the parties' arguments in their motion papers can be addressed summarily. There is no merit to Cranwell's assertion that it is undisputed that Cranwell returned the entire amount of service charges collected to spa employees. At the crux of this case is whether Cranwell can lawfully use the service charge monies to pay part or all of spa employees' commissions and/or hourly wages. Therefore, even if Cranwell's assertion were true, it ignores the plaintiffs' fundamental claims that Cranwell has not paid the tips in a manner consistent with the Tips Act, in proportion to the services provided, or on time.

Cranwell also argues that the Tips Act does not apply to spa services. This is undercut by the statutory text as amended on September 8, 2004, which expanded the scope of the Act to

---

[14]The plaintiffs, as required by G.L. c. 149, § 150, filed a complaint alleging violations of, *inter alia*, G.L. c. 149, §§ 148, 152A, with the Attorney General's office, which authorized the plaintiffs to pursue this case as a civil matter. An employee claiming to be aggrieved by such violations may "institute and prosecute in his own name and on his own behalf, or for himself and others similarly situated, a civil action for injunctive relief and any damages incurred, including treble damages for any loss of wages and other benefits. An employee so aggrieved and who prevails in such an action shall be entitled to an award of the costs of the litigation and reasonable attorney's fees." G.L. c. 149, § 150.

apply to service employees who are not just in the food and beverage industry, but who work in occupations in which employees customarily receive tips and who have no managerial responsibility. G.L. c. 149, § 152A. There can be little doubt that the plaintiffs, to the extent that they have not engaged in managerial work, qualify as service providers protected by the amended statute. See *DiFiore* v. *American Airlines, Inc.*, 454 Mass. 486, 492 (2009).

None of the plaintiffs has any viable claims under the version of the Tips Act in effect before September 8, 2004, as it applied only to food and beverage servers, not spa employees. Two of the plaintiffs--Libardi and Black--terminated their employment before September 8, 2004, and neither continues to assert that the pre-amendment statute protects them with respect to Count I. Accordingly, their claims under the Tips Act fail.

Libardi's and Black's claims in Count II alleging violations of the Weekly Payment of Wages Act, G.L. c. 149, § 148, are time-barred. As noted above, a three year limitations period applies to claims under the Weekly Payment of Wages Act, G.L. c. 149, § 148, as well as to claims under the Tips Act. See G.L. c. 149, § 150. The plaintiffs filed this action on April 23, 2007, which was three years and seven months after Libardi's employment ended, and three years and three weeks after Black's employment ended. Therefore, Cranwell is entitled to summary judgment on Libardi's and Black's claims in Counts I and II of the amended complaint.

Cranwell has also shown as a matter of law that Marshall is not entitled to judgment on her Tips Act claim (or the derivative Weekly Payment of Wages Act claim, to the extent it is based upon alleged violations of the Tips Act) because the Tips Act does not apply to employees with managerial responsibilities, and Marshall engaged in managerial work. Within a few months after being hired at Cranwell in March of 2002, Marshall was promoted from a fitness

11

instructor to the position of fitness supervisor, for which she received a higher pay rate. (Marshall Dep. pp. 11, 86-87). As fitness supervisor, she had managerial responsibility over the four to fourteen employees who worked in the fitness department. (Marshall Dep. pp. 31-32). She was responsible for reviewing employees' performance, reviewing and submitting payroll documents, scheduling employees' work, making sure employees reported to work, that they arrived on time, and that they received education as needed to teach particular classes.

In addition to her managerial responsibilities, Marshall gave fitness instructions for a flat hourly rate of $18 or $18.50. Cranwell imposed a 20% service charge for those fitness classes in 2002 and early 2003 only. Marshall also led groups on hikes and earned a commission of 45% of the flat retail rate charged to patrons. Patrons paid the flat rate, which rose over the years from $25, plus a 20% service charge. Marshall spent 20-40% of her time at Cranwell giving personal training sessions for which the patrons paid a fee plus the 20% service charge.

The Tips Act protects service employees, and defines one as

> "a person who works in an occupation in which employees customarily receive tips or gratuities, and who provides service directly to customers or consumers, but who works in an occupation other than in food or beverage service, *and who has no managerial responsibility*."

G. L. c. 149, § 152A(a) (emphasis added).

The plaintiffs argue that Marshall's managerial responsibilities were "exceedingly slight," and that Marshall is entitled to pursue her claim under the Tips Act because her primary duties entailed performing spa services for patrons rather than managerial tasks.[15] The primary duty analysis is relevant to claims arising under the earlier version of the Tips Act. See, e.g., *DePina*

---

[15] The plaintiffs advance the same argument with respect to Libardi, whose statutory claims have already been determined to fail on other grounds as discussed above.

v. *Marriott International, Inc.*, Suffolk Super. Ct. Civil Action No. 2003-05434 at * 14 (July 28,

2009) (Henry, J.), citing *Mouiny* v. *Commonwealth Flats Dev. Corp.*, Suffolk Super. Ct. Civ. A.

No. 2006-01115 at *8 (Aug. 18, 2008) (Gants, J.) (reading earlier version of Tips Act to include

limitation that service charges be distributed only to employees whose primary duty is to engage

in the service of food and beverages); *Williamson* v. *DT Management, Inc.*, 2004 WL 1050582 at

* 11 (Mass. Super. Ct. March 10, 2004) (Haggerty, J.) (former version of Tips Act was violated

by distribution of service charges to employees whose primary duty was not service of food or

beverages); *Fernandez* v. *Four Seasons Hotels, Ltd.*, Suffolk Super. Ct. Civ. A. No. 2002-04689

at *5 (July 18, 2007) (Muse, J.) (distribution of service charge to employees whose primary duty

was to supervise was a violation of the former version of Tips Act).

In the 2004 version of the Tips Act, the Legislature rendered the primary duty analysis

moot by expressly limiting the statute's protection to employees with "no managerial

responsibility." See G. L. c. 149, § 152A(a).[16] The Tips Act is unambiguous and does not

_____

[16]Equally misplaced is the plaintiffs' reliance upon the "dual jobs" rule set forth in 20 Code Fed. Regs. § 531.56(e) of the Fair Labor Standards Act (the FLSA). Under 20 Code Fed. Regs. § 531.56(e), an employer may take a "tip credit" for employees with dual jobs to the extent that the employee qualifies as a "tipped employee." A tipped employee is an employee engaged in an occupation in which he or she customarily receives a certain amount per month in tips. See 29 U.S.C. § 203(t). A tip credit allows employers under certain circumstances to credit an employee's tips toward the employer's obligation to pay the minimum wage to that employee. See 29 U.S.C. § 203(m); 20 Code Fed. Regs. § 531.56(a). The dual jobs rule authorizes an employer to take a tip credit with respect to an employee with two distinct occupations, such as a hotel's maintenance worker and waiter, but only insofar as the employer is a tipped employee (i.e., a waiter). See 20 Code Fed. Regs. § 531.56(e). The dual jobs rule has no application where an employee has two related duties in one occupation, such as a waitress who also performs non-service duties such as cleaning tables. See 20 Code Fed. Regs. § 531.56(e). The plaintiffs cite no case law supporting their argument that the dual jobs rule applies to the Tips Act.

Moreover, the summary judgment record shows that Marshall did not have two distinct occupations at Cranwell's spa, but that she performed service and *related* non-service duties all within the spa's fitness program. Marshall's job as a fitness supervisor was related to, and based out of the spa's same fitness facility as were her direct services to patrons in providing fitness instructions, personal training, and leading hikes. Because her roles as a spa employee qualify not as dual jobs but as related positions, the dual jobs rule does not apply to her claim under the Tips Act.

13

distinguish between employees who have many managerial responsibilities and those who have few. The Court declines to read into the Tips Act words which the Legislature could have, but did not, include. See *Cooney* v. *Compass Group Foodservice*, 69 Mass. App. Ct. 632, 638 (2007), citing *Commissioner of Revenue* v. *Cargill, Inc.*, 429 Mass. 79, 82 (1999) (where "the language of the statute is clear, it is the function of the judiciary to apply it, not amend it"). Marshall's managerial role at Cranwell unequivocally disqualifies her as a service employee protected by the Tips Act.[17] Because she was not entitled under the Tips Act to the service charges, her derivative claim under the Weekly Payment of Wages Act, that she did not receive pay stubs identifying the tips, also fails. Accordingly, summary judgment must enter for Cranwell on Marshall's claims in Counts I and II of the amended complaint.[18]

As to Counts I and II, the surviving plaintiff is Riccio-Major, whose statutory claims are not time-barred (because she continues to work at Cranwell), or precluded by the nature of her work, as she has had no managerial responsibilities at Cranwell. There is no question that Cranwell has had an obligation, since the 2004 amendment of the Tips Act, to pay non-managerial spa employees such as Riccio-Major the service charges collected for services they have performed.

Although the parties dispute whether Cranwell has paid Riccio-Major the service charges

---

[17]When Marshall performed some spa services for patrons, Cranwell collected a 20% service charge, which Cranwell argues it paid to Marshall even though it was not required to do so. For the reasons explained in this decision, the Court agrees that the amended Tips Act does not obligate Cranwell to pay Marshall the service charges it collected after September 8, 2004, for spa services performed by Marshall due to her managerial role. It is troubling that Cranwell can pocket those service charges without running afoul of the Tips Act, but it is up to the Legislature, not the judiciary, to resolve apparent inequities produced by the Tips Act.

[18]This conclusion is bolstered by an advisory opinion by the Attorney General's Office, explaining that "Workers with limited managerial responsibility . . . do not qualify as wait staff employees" protected by the Tips Act. Attorney General Advisory 2004/3.

for her work, Cranwell cannot prevail even if a fact-finder were to credit Cranwell's evidence showing that it remits all of the services charges to spa employees. Under Cranwell's own description of its payroll method, there is no factual question that it has not paid the service charges to Riccio-Major in conformity with the Tips Act or documented their payment in pay stubs as required by the Weekly Payment of Wages Act.

As recounted by Cranwell, it collects the services charges into one account and ultimately, at the end of each month, applies the entire amount of that account toward spa employees' payroll. Cranwell concedes that it uses the service charges collected to pay a portion of spa employees' commission and/or hourly wages, which enables Cranwell to retain more income. It makes no effort to determine the amount of service charges which should be given to each spa employee in proportion to the services provided, and denies any obligation to do so on the grounds that spa employees' tips are included within their commissions and hourly wages. Contrary to Cranwell's arguments, the fact that Cranwell applies the service charges it has collected to pay spa employees' payroll, so that the service charges ultimately end up in the spa employees' paychecks, does not bring Cranwell's practice into compliance with the Tips Act. This approach is riddled with difficulties.

First, by collecting and distributing the service charges in this way, Cranwell essentially appropriates the service charges to meet its own obligation to pay spa employees, rather than doing what the statute unambiguously requires: to remit the total proceeds of each service charge solely to the persons who performed the spa services and in proportion to the services provided. See G. L. c. 149, § 152A(d). After all, the service charge is paid by patrons for the employees who provided the service; it does not belong to Cranwell and, it follows, should not be used by

15

Cranwell for its own purposes. See *Cooney* v. *Compass Group Foodservice,* 69 Mass. App. Ct. at 637, 638 ("tips . . . belong to employees"; the Tips Act's "clear purpose" is "letting employees keep these payments").[19]

Cranwell's method of channelling service charges to employees' payroll could be viewed alternatively as either depriving spa employees of their tips outright or as reducing their non-tip compensation in order to pass on service charges, but in either case, it violates the Tips Act. By its own account, Cranwell uses the service charges to pay increasing amounts of spa employees' non-tip compensation the more hours that each spa employee spends providing spa services. The result under Cranwell's version of how it distributes the service charge is that what Cranwell purportedly remits in tips-converted-to-general-payroll, it deducts from the spa employees in non-tip compensation. This method of distribution is plainly inconsistent with and frustrates the purpose of the Tips Act. See G.L. c. 149, § 152A (b) ("No such employer or other person shall retain *or distribute in a manner inconsistent with this section* any tip or service charge given directly to the employer or person") (emphasis added). Cf. *Mullally* v. *Waste Management of Massachusetts, Inc.,* 452 Mass. 526, 531-532 (2008) (rejecting employer's complicated payroll formula using a "floating base rate" because it frustrated the purpose of the overtime act and the prevailing wage act).

Cranwell's variably defined service incentive fee, also known as a productivity fee and bridge, is an artificial and fluctuating compensation component used to convey the impression

---

[19]Legislatures in other jurisdictions have expressly prohibited employers from deducting tips from wages paid to service employees. See Calif. Labor Code § 351; *Jou Chau* v. *Starbucks Corp.,* 174 Cal.App.4th 688, 691, 94 Cal.Rptr.3d 593, 594 (2009). The Court reads this prohibition to be implicit in the Tips Act's prohibition against distributing tips in a manner inconsistent with the statute.

that spa employees always receive, as part of their regular payroll, the full amount of the service

charge, but at the expense of other components of the employees' compensation. Cranwell's

shifting payroll formula and calculations appear to be "nothing more than after-the-fact

computations" which bear no resemblance to its compensation agreements set forth in the

personnel status sheets and provide no meaningful trail of the service charges collected. Cf.

*Triple "AAA" Company, Inc.* v. *Wirtz*, 378 F.2d 884, 886 (10th Cir. 1967) (charts and tables

prepared by employer defendant for trial on claims under overtime provisions of FLSA appeared

to be nothing more than after-the-fact computations where plaintiff employees' testimony

revealed that the charts and tables were at odds with any underlying agreement regarding a

regular rate of compensation for the first 40 hours worked each week).[20]

Cranwell cannot defend this payroll method or sidestep its obligations under the Tips Act

by arguing that spa employees' tips are included within their commissions or the flat rates paid

per service since the rate freeze took effect. Nothing in the spa employees' compensation

agreements supports Cranwell's assertion that spa employees actually agreed that their

commissions would be paid in part or whole out of the service charges. The personnel status

sheets setting forth spa employees' compensation agreements are devoid of references to the

---

[20]In the analogous context of overtime pay, such "creative accounting" methods designed to evade overtime regulations by reducing employees' regular pay are proscribed by courts and in the governing regulations. See, e.g., *Mullally* v. *Waste Management of Massachusetts, Inc.*, 452 Mass. at 529 n.8 (employer's use of a "buffer check" was an "artificial device" designed to make base pay rate appear fixed when it was actually a floating weekly rate dependent upon number of overtime hours actually worked, used to avoid paying proper overtime rate); 29 Code Fed. Regs. § 778.327(a) ("It is obvious that as a matter of simple arithmetic an employer might adopt a series of different rates for the same work, varying inversely with the number of overtime hours worked in such a way that the employee would earn no more than this straight time rate no matter how many hours he worked . . . . [T]his is an obvious bookkeeping device designed to avoid the payment of overtime compensation and is not in accord with the law"); *Walling* v. *Helmerich & Payne*, 323 U.S. 37, 41 (1944) (payroll formula which did not allow extra compensation to be paid for overtime hours was not derived from actual hours and wages, but from "ingenious mathematical manipulations" designed to avoid statutorily mandated overtime pay).

service charge, tips or gratuities, nor are there other written employment agreements which buttress Cranwell's position. Cranwell's explanations to spa employees (and in this litigation) about how the service charges make their way into the spa employees' paychecks are inconsistent at best.

Even assuming for the sake of argument only that some employees did agree orally that the service charges could be used to pay their commissions, Cranwell fares no better because employers cannot shirk their responsibilities under the Tips Act by entering into employment contracts with employees waiving the Act's provisions. See G.L. c. 149, § 152A. Cranwell has identified no legal basis upon which to justify its practice of paying the agreed-upon wages pursuant to its compensation contracts with the same funds which Cranwell is independently obligated to remit to the spa employees under the Tips Act.[21]

Equally unpersuasive is Cranwell's argument that if the plaintiffs are due the service charges as alleged, the result would be an absurd compensation rate of 59-69% of the retail cost of each spa service performed. This argument ignores Cranwell's wide leeway in structuring the compensation of its spa employees. Massachusetts wage laws have not required Cranwell to pay hourly rates above the minimum wage, nor has Cranwell been obligated to pay the commission rates it set before the 2006 pay rate freeze. Moreover, Cranwell could have used 20% charge for payroll had it labelled the fee an administrative fee rather than a service charge. Cranwell's

---

[21] An opinion letter dated January 8, 2008, from the Deputy General Counsel of Massachusetts' Executive Office of Labor and Workforce Development, Division of Occupational Safety, provides some guidance on this point. When asked whether a service charge may constitute the entire minimum wage required by state law, the Deputy General Counsel noted that the Tips Act "does not provide that services [sic] charges may be paid in lieu of an employee's wage--either the statutory minimum wage or the $2.63 service rate." (See Joint Appendix Exh. 39). There is no reason to conclude that the Tips Act would permit service charges to be paid in lieu of an employee's commission or hourly wage rate, either.

decision to compensate spa employees as it has does not free Cranwell from complying with the Tips Act.

The Tips Act requires that the tips be distributed to each employee who performed the service that day or within six days of the end of the next pay period, consistent with schedule outlined in the Weekly Payment of Wages Act. Although Cranwell pays its employees bi-weekly, it accumulates service charges throughout each month and only applies them toward payroll at the end of the month. Therefore, when Cranwell pays spa employees their compensation for the first two weeks of the month, Cranwell has not yet accounted for the service charges collected in connection with those spa services. (See Conboy Dep. p. 170). This, and Cranwell's failure to pay any service charge to spa employees within the requisite period (or at all), violate the Tips Act. See G. L. c. 149, § 152A (b), (e); G.L. c. 149, § 148.[22]

Cranwell has not provided Riccio-Major with pay stubs which itemize the increases in her compensation due to tips, see G.L. c. 149, § 148 (employer required to give employee pay stubs showing, *inter alia*, the amounts of deductions or increases from wages made for each pay period), or pay stubs which show that the amounts of tips paid are proportionate to the services provided, see G.L. c. 149, § 152A (d) (requiring employer to remit total proceeds of service charge to service employees "in proportion to the service provided by those employees"). Riccio-Major's pay stubs list two types of pay: regular and commission. They identify the number of hours she has worked and her hourly rate of pay, but do not itemize service charges payable to Riccio-Major in proportion to services she provided, as required by G.L. c. 149, §

---

[22]Where violations of the Tips Act and the Weekly Payment of Wages Act overlap, Riccio-Major would be limited to a single recovery.

148.[23]

There is no merit to Cranwell's argument that spa employees' claims under the Weekly Payment of Wages Act fail because none of the spa employees' earnings constitute wages within the meaning of that statute. Cranwell asserts that spa employees earn no base salaries, but rather compensation payable upon contingencies: the amount and type of spa services they provide, if any.

Neither the undisputed facts nor the case law relied upon by Cranwell support its contention that G.L. c. 149, § 148, does not cover the spa employees' compensation. Since the 2006 rate freeze, spa employees have been paid a flat fee per service provided, regardless of the amount of service charges collected by Cranwell. Although some employees work on an "on call" basis, the amounts they earn for performing each service are not contingent upon any factor other than how often they work. The Weekly Payment of Wages Act protects casual employees who work less than five days in a pay period, as well as employees who work longer hours. See G.L. c. 149, § 148. The Act also applies to the payment of commissions "when the amount of such commissions . . . has been definitely determined and has become due and payable to such employee." G.L. c. 149, § 148. Therefore, Cranwell's payment of commissions which vary by the number and types of spa services provided come within the protection of G.L. c. 149, § 148.[24]

---

[23]Likewise, the regulations to the Fair Labor Standards Act (FLSA) mandate that for each pay period, employers record all additions to employees' wages, including the "dates, amounts, and nature of the items which make up the total additions and deductions." See 29 Code Fed. Regs. § 516.2(a) (10). Cranwell does not dispute that it is subject to the FLSA and its regulations.

[24]In rejecting a similar argument that a plaintiff's commissions fell outside the scope of the Weekly Payment of Wages Act because they were triggered by contingencies, Judge Gants wrote,

"All commissions are based on contingencies, such as the completion of a sale. If commissions were not protected by G.L. c. 149, §148, because they became payable only when something happened, then the Legislature would be engaged in a sham to have amended the statute to include commissions, because all

In cases suggesting that compensation payable only upon some contingency is not a "wage" under G.L. c. 149, § 148, the salaries at issue were contingent upon conditions other than the employees performing his or her jobs. See, e.g., *Cumpata* v. *Blue Cross Blue Shield of Massachusetts, Inc.*, 113 F.Supp.2d 164, 168 (D. Mass. 2000) (employee's commissions above and beyond base salary and contingent upon exceeding sales quotas are not wages); *Dennis* v. *Jager, Smith & Stetler, P.C.*, 2000 WL 782946, * 1 (Mass. Super. Ct. April 10, 2000) (Ball, J.) (attorney's substantial and irregular compensation in the form of a draw is not a wage, nor was attorney's annual compensation which was contingent on "a number of factors" unspecified in decision); *Baptista* v. *Abbey Healthcare Group, Inc.*, 1996 WL 33340740, * 4 (D. Mass. 1996) (Stearns, J.) (stock options or bonuses granted as part of plaintiffs' executive compensation package were contingent compensation in contrast to an assured compensation such as paid vacations associated with regular wages or salary).  An employee's performance of her job does not amount to the type of contingency which undercuts the protection of the Weekly Payment of Wages Act.  Cf. *Stanton* v. *Lighthouse Financial Services, Inc.*, 621 F. Supp.2d 5, 14 (D. Mass. 2009) (where an employee's base salary is not contingent upon her performing any condition beyond performing her job, the compensation is a wage).

For all of these reasons, Riccio-Major is entitled to summary judgment as to liability on Counts I and II of the amended complaint.

---

(or virtually all), commissions would fall outside the protection of the statute. The Legislature intended no sham. It required simply that the commissions be 'definitely determined' meaning that the contingency must already have occurred and the amount due be capable of being precisely ascertained."

*Lohnes* v. *Darwin Partners, Inc.*, 15 Mass. L. Rptr. 157, 159 (Sept 30, 2002) (Gants, J.).

### B. Common Law Claims

In Count III of their amended complaint, the plaintiffs allege that Cranwell breached its express or implied contracts or agreements with patrons to pay the 20% service charge to the plaintiffs as spa employees who provided the spa services. The plaintiffs claim to be third-party beneficiaries of these contracts or agreements between Cranwell and its patrons. In Count IV, the plaintiffs assert that Cranwell's conduct violated the implied covenant of good faith and fair dealing inherent in the contracts or agreements between Cranwell and its patrons. In Count V, the plaintiffs claim that the defendants are liable for the tort of conversion by retaining the service charges and converting them to their own use rather than distributing them to the plaintiffs.

"[W]here a statute has been enacted seemingly intended to cover the whole subject to which it relates, including a remedy for its infraction, other provisions of the common law, including such as are remedial in nature, are thereby superseded." *School Comm. of Lowell* v. *Mayor of the City of Lowell*, 265 Mass. 353, 356 (1928) (school committee members could not maintain petition for writ of mandamus ordering city to appropriate funding for schools where Legislature enacted G.L. c. 71, § 34, which provided a comprehensive remedy in place of whatever relief might otherwise be available; petitioners had no right to seek in their own names the statutory remedy, and duty which petitioners sought to have enforced was wholly a creature of statute and nonexistent at common law). Courts have applied this principle where the duty which the plaintiff seeks to enforce did not exist at common law and is wholly a creature of statute. *School Committee of Boston* v. *Reilly*, 362 Mass. 334, 338 (1972). Where the duty sought to be enforced is contractual and is not "wholly the creature of statute," and the right or

remedy could have been included in the contract, and where the statutory language does not

warrant the conclusion that the statute was intended to restrict previously existing common law

remedies for breach of contract in the employer-employee context, the statute does not displace

the previous common law remedies for breach of contract. See *id.* at 338-339.

Although the Legislature did not expressly render the Tips Act's remedies exclusive and

the Supreme Judicial Court has not yet squarely addressed this question, this Court finds

persuasive the reasoning of other Superior Court Justices who have concluded that the Tips Act

implicitly supersedes other provisions of the common law which might provide a remedy. See,

e.g., *DePina* v. *Marriott International, Inc.*, Suffolk Super. Ct. Civil Action No. 2003-05434 at

\*18 (July 28, 2009) (Henry, J.); *Godt* v. *Anthony's Pier Four, Inc.*, Suffolk Super. Ct. Civil

Action No. 2007-03919 at \*11 (March 24, 2009) (Hinkle, J.); *Mouiny* v. *Commonwealth Flats*

*Dev. Corp.*, Suffolk Super. Ct. Civil Action No. 2006-01115 at \*15 (August 18, 2008) (Gants,

J.). For this reason, and to the extent that the common law claims are duplicative of Count I, the

common law remedies sought by the plaintiffs are not available for the period during which the

Tips Act applied to spa employees, i.e., from September 8, 2004, to the present. Therefore,

Cranwell is entitled to summary judgment on Counts III, IV, and V insofar as these claims are

based on spa services performed after September 8, 2004.

At issue, then, is the extent to which the plaintiffs' common law claims arising before the

effective date of the current Tips Act survive summary judgment. The contract-based claims and

the conversion claim seek to enforce duties which are arguably not "wholly the creature of

statute," particularly where it is undisputed that Cranwell instructed employees to inform patrons

that Cranwell would give the service charge monies to the spa employees. Cranwell has not

shown that the plaintiffs waived their right to the service charges, and nothing in the language of the Tips Act supports the conclusion that it was intended to restrict previously existing common law remedies for breach of contract or in tort in the employer-employee context. Consequently, the Tips Act does not displace the previous common law remedies available in contract or for conversion for the period before the effective date of the current Tips Act. See *School Committee of Boston* v. *Reilly*, 362 Mass. at 338-339.

   To prevail in their conversion claim, the plaintiffs must prove that Cranwell intentionally or wrongfully exercised ownership, control or dominion over the service charges, which are allegedly "personal property to which [the defendant] has no right of possession at the time." See *Grand Pacific Finance Corp.* v. *Brauer*, 57 Mass. App. Ct. 407, 412 (2003). The conversion claim must be dismissed with respect to Black and Libardi, in light of the three year limitations period and their cessation of employment on April 1, 2004, and August 2003, respectively.[25] The statute of limitations does not preclude Riccio-Major's and Marshall's conversion claim insofar as it is based on service charges collected for spa services they performed between April 23, 2004, and September 8, 2004, only. For two reasons, however, they are not entitled to summary judgment on this claim. First, for the period during which their conversion claim is viable, the amended Tips Act was not in existence. Therefore, Riccio-Major and Marshall cannot argue, as the plaintiffs in *Williamson* v. *DT Management, Inc.* did, that Cranwell converted money that, under the Tips Act, belonged to them. See 2004 WL 1050582 (Mass. Super. Ct. March 10, 2004) (Haggerty, J.). Secondly, even if the current Tips Act were in existence, the instant case is

---

[25]To come within the three year statute of limitations, any tort claim would have to be based on conduct which occurred on or after April 23, 2004. Neither Black nor Libardi has alleged that Cranwell tortiously converted their tips during this period.

distinguishable from *Williamson* because in *Williamson*, the employer did not dispute that it withheld from its employees a percentage of the service charges which it collected from patrons and paid it to management personnel. Cranwell, on the other hand, claims that it paid the *entire* amount of the service charges which it collected to its employees, while Riccio-Major and Marshall claim that it did not. The existence of that factual dispute precludes summary judgment.

Consequently, the plaintiffs' cross-motion for summary judgment on Count V is denied. The defendants' motion for summary judgment on Count V is denied with respect to service charges collected by Cranwell between April 23, 2004, and September 8, 2004, for spa services performed by Riccio-Major and Marshall, and otherwise allowed.[26]

The related claims for breach of contract and breach of the implied covenant of good faith and fair dealing carry a six year limitations period, but here pertain at most to the period beginning on March 2002 (when the spa opened) until September 8, 2004, when the amended Tips Act superseded the plaintiffs' common law claims for the same conduct. A third party may bring an action for breach of contract when "one person, for valuable consideration, engages with another, by simple contract, to do some act for the benefit of a third." *Rae* v. *Air-Speed, Inc.*, 386 Mass. 187, 195 (1982). In order to prevail on a claim for breach of contract as a third-party beneficiary, the plaintiffs must show that Cranwell and the patrons intended to give the plaintiffs the benefit of the promised performance. See *Lakew* v. *Massachusetts Bay Transportation*

---

[26]In the event that Riccio-Major and/or Marshall prevail on their conversion claim, any damages awarded which would be duplicative of their recovery under any other count would not be recoverable. See, e.g., *Calimlim* v. *Foreign Car Center, Inc.*, 392 Mass. 228, 236 (1984) ("where the same acts cause the same injury under more than one theory . . . duplicative damages recoveries will not be permitted").

*Authority*, 65 Mass. App. Ct. 794, 797-798 (2006).  The parties' intention must be determined

from the language and circumstances of the contract, and the intent must be definite and clear.

See *id.*  Moreover, "[a] binding contract requires mutual assent to all essential provisions."

*Constantino* v. *Frechette*, 73 Mass. App. Ct. 352, 356 (2008).

Cranwell and its patrons had an agreement:  Cranwell would provide spa services to

patrons in exchange for the patrons' payment of the retail price of the services for Cranwell.

Cranwell also charged patrons a 20% service charge, and informed them that it would give the

service charges collected to the service personnel.  The patrons were the intended beneficiaries of

the spa service for which they paid, and the spa employees were the intended beneficiaries of the

service charges paid.

A factual question exists as to whether the patrons' agreement to pay the service charges

was with the understanding that Cranwell would pay those charges to spa employees over and

above their non-tip compensation rather than simply distribute them in their entirety to the

employees in some way, as Cranwell claims it did.[27]  Because a genuine issue of material fact

exists as to whether Cranwell breached its contract with spa patrons, none of the plaintiffs are

entitled to summary judgment on Count III.

The claim for breach of the covenant of good faith and fair dealing (Count IV) is based

upon the same theory as the breach of contract claim, and the same genuine issue of material fact

precludes entry of summary judgment for either side.  Any damages awarded under this theory

would be duplicative of breach of contract damages, and therefore would not be recoverable.  See

---

[27]Whether there was mutual assent, i.e., a "meeting of the minds" on this point between Cranwell and the patrons may also create a factual question concerning the very existence of any alleged contract. See *Constantino* v. *Frechette*, 73 Mass. App. Ct. at 356.

*Linkage Corp.* v. *Trustees of Boston University*, 425 Mass. 1, 20 (1997) (damages awarded for

breach of the covenant of good faith and fair dealing were not recoverable because they were

duplicative of damages awarded for breach of contract); *Calimlim* v. *Foreign Car Center, Inc.*,

392 Mass. 228, 236 (1984).


## II. The Defendants' Motions to Strike

### A. Motion to Strike Portions of the Affidavit of Plaintiff Suzanne Riccio-Major

During her deposition, the plaintiff Riccio-Major testified that it was generally well

known among Cranwell's spa employees in the summer of 2002 that any tip on a spa service was

going to be included in each employees' payment of the respective percentage of the amount

billed for services provided to each patron. In her affidavit in opposition to Cranwell's motion

for summary judgment, however, Riccio-Major stated that "It is my understanding that neither

my percentage commission or my frozen rates have ever included the Service Charge that

Cranwell Resort Collects on my massages" and that "I believe that all of the spa employees know

that we do not receive Service Charges."

Cranwell moves to strike this portion of the affidavit on the grounds that it directly

contradicts her deposition testimony. It does not. The deposition testimony concerned Riccio-

Major's understanding in the summer of 2002, when she was a new employee, based on

conversations she had at that time with her supervisor. In contrast, Riccio-Major's affidavit,

written in April 2009, which is consistent with her answers to interrogatories, expresses her

understanding and her belief about other spa employees' understanding in 2009 that Cranwell has

not distributed tips or service charges to the plaintiffs. Therefore, the defendants' motion to

27

strike portions of her affidavit is denied.

### B. Motion to Strike Certain Exhibits and Portions of the Plaintiffs' Statement of Material Undisputed Facts

Cranwell also moves to strike, on grounds of immateriality and irrelevance, materials in the summary judgment record which indicate that Cranwell pays its food and beverage ("F&B") employees differently than the spa employees, and that the F&B employees' pay stubs itemize tips paid.

Cranwell has not shown that the statements and exhibits submitted by the plaintiffs regarding Cranwell's payments to F&B employees, and specifically its treatment of tips, are irrelevant or immaterial to this action. Although Cranwell's treatment of its F&B employees is not determinative of whether it breached its legal obligations to spa employees, the difference in treatment could be relevant to show at least that Cranwell was able to, and did, pay some of its employees tips in a way as to distinguish tips from hourly wage rates. Consequently, the defendants' motion to strike these materials is denied.

### ORDER

For all the foregoing reasons, it is hereby **ORDERED** as follows:

1.  The Defendants' Motion for Summary Judgment with respect to Counts I and II is **ALLOWED** as to the plaintiffs Libardi, Marshall and Black, and **DENIED** as to Riccio-Major.

2.  The Plaintiffs' Cross-Motion for Summary Judgment with respect to Counts I and II is

DENIED as to Libardi, Marshall and Black, and ALLOWED as to Riccio-Major with respect to liability only.

3.      The Defendants' Motion for Summary Judgment with respect to Counts III and IV is ALLOWED insofar as they are based upon spa services performed on or after September 8, 2004, and DENIED insofar as they are based upon spa services performed before September 8, 2004.

4.      The Plaintiffs' Cross-Motion for Summary Judgment with respect to Counts III, IV, and V is DENIED.

5.      The Defendants' Motion for Summary Judgment on Count V is ALLOWED except with respect to spa services performed by Riccio-Major and Marshall between April 23, 2004, and September 8, 2004.

6.      The Defendants' Motions to Strike are both DENIED.

Daniel A. Ford
Justice of the Superior Court

Dated:  October 21 , 2009

29

A True Copy
Attest: _____
                    Clerk