UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| HERNAN MATAMOROS,<br>SHARON SAM CHAN,<br>KATE PETERSEN<br>and all others similarly situated,<br><br>            Plaintiffs,<br><br>v.<br><br>STARBUCKS CORPORATION,<br><br>            Defendant. | Civil Action No. 08- 10772-(NMG)<br><br>**JURY DEMANDED**<br><br>**MOTION FOR LEAVE TO<br>FILE EXCESS PAGES GRANTED<br>MARCH 23, 2010** |

**DEFENDANT STARBUCKS CORPORATION'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## I.   INTRODUCTION

Customers in Starbucks stores are not served by a single employee, but rather by a team of hourly partners who work side-by-side taking orders, making drinks, operating the cash register, and delivering the customer's order.  This team of Starbucks partners includes "baristas" and "shift supervisors," both of whom spend the vast majority of their time performing the same customer service tasks.  These two hourly-paid customer service positions share in the gratuities left in tip containers at Starbucks stores.

Plaintiffs Sharon Sam Chan, Hernan Matamoros and Kate Petersen are former Starbucks baristas who claim that baristas should get *all* of the tips, regardless of who earned them. Plaintiffs in several other states have asserted similar claims, all in the wake of a $100 million judgment against Starbucks in California.  That judgment was unanimously reversed, however, when the California Court of Appeals held that Starbucks did not violate California law "by permitting shift supervisors to share in the tip proceeds that were left in a collective tip box for

baristas *and shift supervisors*." *Chau v. Starbucks Corp.*, 174 Cal. App. 4th 688, 697 (Cal. App. 4th Dist. 2009) (emphasis added). Since the Court of Appeals decision—in which Starbucks policy was found to ensure that "each employee will retain his or her fair share of the tip proceeds" (*id.* at 703)—claims that baristas should get all the tips have been rejected, withdrawn, or dismissed in New York, Minnesota, and Pennsylvania.

The result in Massachusetts should be no different. The Massachusetts tip statute prohibits an employer from taking tips "given to . . . [a] wait staff employee" or forcing such an employee to 'remit' his or her tips to a person who is not a "wait staff employee." Mass. Gen. Laws ch. 149, § 152A(b)-(c). Plaintiffs contend that only they, as baristas, were "wait staff employees," and that they therefore are entitled to all the tips earned by the team. This claim fails for two reasons.

*First*, plaintiffs have not been denied any tips that they earned. The statute explicitly defines "tips" as money "given as an acknowledgment of any service performed by a wait staff employee, service employee, or service bartender." Mass. Gen. Laws ch. 149, § 152A(a). Thus, to prove a claim, plaintiffs must show that an ineligible employee took tips "given as an acknowledgment of any service performed by" *plaintiffs*. The record precludes any such showing. Plaintiffs admit that they do not know whether any tips left in the containers were actually intended for them, presumably because customers were served by a team that included shift supervisors as well. Nor can plaintiffs prove that they earned a greater portion of the tips by performing more of the customer service, since the two jobs are virtually indistinguishable. In short, the shift supervisors only received the tips they earned themselves, and thus took no tips "given as an acknowledgement of any service performed" by plaintiffs. Because the statute

creates no right for plaintiffs to recover the tips given to others, their claim must fail, regardless of whether the shift supervisors were "wait staff employees."

*Second*, plaintiffs' claim also fails because the shift supervisors were, in fact, "wait staff employees" and thus properly included in the tip distribution.  A worker is a "wait staff employee" if he or she (1) works in a "place where prepared food or beverages are served," (2) "serves beverages or prepared food directly to patrons," and (3) "has no managerial responsibility."  Mass. Gen. L. ch. 149, § 152A(a).  Plaintiffs cannot dispute the first two criteria, given that the shift supervisors spent most of their time performing the same work as they did. Plaintiffs are forced to contend, therefore, that the shift supervisors were precluded from receiving the tips they earned because they had "managerial responsibility."  This claim is belied by the undisputed record, which shows that the shift supervisors had absolutely no authority to interview, hire, schedule, transfer, evaluate, promote, discipline, fire, or determine pay for any other employees.  After finding similar facts, the Southern District of New York recently rejected a claim that shift supervisors could not receive tips because they were Starbucks "agents," a term broadly defined as including "a manager, superintendent, foreman [and] supervisor."  *In re Starbucks Employee Gratuity Litig.*, No. 08 Civ. 3318 (LTS)(JCF), -- F.R.D. --, 2009 WL 4884163, at *4 (S.D.N.Y. Dec. 16, 2009).  The facts compel the same conclusion in Massachusetts, where no court has ever held that hourly customer service employees with no power over their co-workers are precluded from receiving the tips they helped generate.  Indeed, denying shift supervisors tips would undermine the statute's purpose, which is to ensure that tips go to the customer service workers who earned them.  In short, because the shift supervisors were "wait staff employees" themselves, they were entitled to the tips they earned.

In addition to claiming that baristas should get all the tips, plaintiffs assert two other claims under the tip statute, both of which are equally meritless.  In the first, they contend that Starbucks violated the statute by distributing tips on a weekly basis.  This claim fails because the statute's timing requirement applies only to tips "remitted . . . to an employer," not those deposited in a collective container and then distributed by and among the customer service workers themselves.  Mass. Gen. Laws ch. 149 § 152A(e).  But regardless, even if the timing provision applied, it was satisfied, because plaintiffs admittedly received their tips within seven days of when they earned them, which is all the statute requires.

Plaintiffs also claim that Starbucks violated the statute by denying them tips during training.  This claim fails as to both Chan and Petersen because neither of them participated in training in Massachusetts within the applicable limitations periods.[1]

Finally, in addition to asserting claims under the tip statute, Plaintiffs allege that the same tipping practices violated various common law theories—breach of an implied contract, intentional interference with advantageous relations and unjust enrichment/*quantum meruit*.  These common law claims are superseded by plaintiffs' statutory claims and must be dismissed for that reason alone.  But regardless, as shown below, they fail for a variety of other reasons as well.

## II.  **BACKGROUND**

### A.  **Plaintiffs' Stores and Job Duties**

Plaintiffs worked as baristas at Starbucks stores in Massachusetts.  Matamoros worked at a store in Chestnut Hill for a week-and-a-half in February 2008.  (Defendant Starbucks

---

[1] Factual disputes exist as to whether Matamoros received tips consistent with Starbucks policy during his training period.  Accordingly, this motion does not address his training claim.

Corporation's Statement of Undisputed Material Facts in Support of Motion for Summary Judgment ("UF") ¶ 1.)  Petersen worked at a store in Somerville from April 2006 through October 2007.  (*Id.* ¶ 3.)  Chan worked at a store in Needham, as both a barista and shift supervisor, on and off from 1997 through 2006.  (*Id.* ¶ 2.)

Each plaintiff reported to a store manager, who was a salaried, full-time partner.  (*Id.* ¶ 5.) The store managers supervised all the partners in the store, including the baristas and the shift supervisors.  (*Id.*)  The store managers were responsible for interviewing, hiring, scheduling, evaluating, promoting, disciplining, and firing the store partners.  (*Id.* ¶ 6.)  Assistant store managers assisted with these responsibilities as well.  (*Id.*)

Plaintiffs and the other baristas with whom they worked were part-time, hourly-wage employees.  (*Id.* ¶ 7.)  Plaintiffs' duties as baristas were focused on customer service and included taking orders from customers, operating the cash registers, serving pastries, and making and serving drinks.  (*Id.*)  Plaintiffs also cleaned, washed dishes, bussed tables, refilled the condiment bar, stocked product and put away orders.  (*Id.*)  The baristas in plaintiffs' stores also participated in training new partners and providing coaching on how to perform tasks.  (*Id.*)

Like the baristas, the shift supervisors with whom plaintiffs worked were part-time, hourly-wage employees.  (*Id.* ¶ 8.)  They did not interview, hire, evaluate, transfer, promote, issue formal discipline, fire, or set pay for baristas or any other Starbucks partners.  (*Id.* ¶ 12.) Nor did they prepare the work schedule, approve overtime work, process payroll, maintain sales or production records or prepare the store budget.  (*Id.*)

Instead, the shift supervisors worked together with the baristas to provide customer service.  (*Id.* ¶ 9.)  They performed all the same tasks as baristas, including taking orders, operating the cash registers, making and serving drinks, serving pastries, restocking product and

cleaning.  (*Id.*)  The shift supervisors spent the vast majority of their time, up to 90 percent, performing the same tasks as baristas.  (*Id.* ¶ 8.)  On some shifts, two shift supervisors worked at the same time, in which case one functioned solely as a barista.  (*Id.* ¶ 9.)

Beyond their barista duties, shift supervisors performed a few additional tasks.  (*Id.* ¶ 10.) They opened and closed the store, which involved unlocking and locking doors and deactivating and activating alarms.  (*Id.*)  They also handled cash, which involved opening and depositing money into the safe and counting the tills.  (*Id.*)  Shift supervisors also could "deploy" partners, ensuring that the team members, including themselves, rotated through the various work stations, such as the cash registers and the bar.  (*Id.*)  Shift supervisors also could remind other partners of when to take their scheduled breaks and sometimes addressed customer complaints.  (*Id.*)

### B.   **Tips**

Plaintiffs' stores included containers where customers could leave tips.  (*Id.* ¶ 14.)  To ensure that tips are distributed fairly among the hourly partners who provide the customer service, Starbucks maintains a policy that specifies that tips are to be distributed among baristas and shift supervisors according to hours worked.  (*Id.*)  On a weekly basis, the shift supervisors and baristas determine an hourly tip rate by dividing the total amount of tips collected by the total number of qualifying hours worked that week by baristas and shift supervisors.  (*Id.* ¶ 15.) Each barista and shift supervisor receives a portion of the tips equal to the store's hourly tip rate for the week multiplied by the number of hours he or she worked.  (*Id.*)  Plaintiffs understood that tips were distributed based on hours worked and that they would not receive tips on any other basis or in any particular amount.  (*Id.* ¶ 17.)

Plaintiffs admit that they have no evidence regarding whether any particular tip in the container was left specifically for them.  (*Id.* ¶ 16.)  They surmise that tips were left for customer

service work such as serving customers, ringing the register, taking orders, and cleaning the store.  (*Id*.)  But plaintiffs admit that the shift supervisors performed all of these customer service tasks too.  (*Id*.)  Moreover, plaintiffs admit that many tips actually were intended specifically for shift supervisors.  (*Id*.)

Starbucks policy requires the distribution of tips on a weekly basis.  (*Id.* ¶ 15.)  Consistent with this policy, tips in plaintiffs' stores were distributed within a week of when they were earned.  (*Id*.)

## III.   __PROCEDURAL HISTORY__

Matamoros filed this lawsuit on March 25, 2008, just six days after a trial court ruled in *Chau v. Starbucks* that the company owed baristas $100 million for having permitted shift supervisors to receive a portion of the tips left in its California stores.  (Declaration of Jessica W.P. D'Arrigo ("D'Arrigo Decl.") ¶ 3; Exhibit A to Notice of Removal [DE 1].)  Matamoros, who was later joined by Chan and Petersen, asserts the same theory as in *Chau*:  Starbucks violates the law—in this case, Massachusetts' tip statute and common law—by allowing shift supervisors to receive tips.  Plaintiffs also claim that Starbucks unlawfully distributes tips on a weekly basis and unlawfully excludes certain portions of training from the tip distribution.  (Third. Am. Compl. ¶¶ 11-12.)  As in *Chau*, plaintiffs purport to represent a class of baristas.  (*Id.* ¶ 1.)

Like plaintiffs here, other former baristas filed similar class actions—asserting similar state law claims on behalf of putative classes of baristas—in other states following the trial court decision in *Chau*.  These cases include *Block v. Starbucks* (No. 2:08-cv-1956-BWK) in Pennsylvania, *In re Starbucks Employee Gratuity Litig.* (No. 08-cv-3318-LTS) in New York, and *Delsing v. Starbucks* (No. 08-cv-1154-PSJ-JSM) in Minnesota.  (D'Arrigo Decl. ¶ 4.)

On June 2, 2009, after this and the other copycat lawsuits were commenced, the California Court of Appeals unanimously reversed the trial court's decision in *Chau*, 174 Cal. App. 4th at 697.  The Court of Appeals held that Starbucks did not violate California law "by permitting shift supervisors to share in the tip proceeds that were left in a collective tip box for baristas *and* shift supervisors."  *Id.* (emphasis in original).  In reaching this conclusion, the court found that:

- shift supervisors spend "about 90 to 95 percent of their time performing the same service tasks as do the baristas;"

- "customers who place money in the tip box understand and intend that the money will be shared by the entire team, including baristas and shift supervisors;"

- Starbucks policy of dividing tips based on time worked ensures that "each employee will retain his or her fair share of the tip proceeds;" and

- "the shift supervisor keeps only his or her earned portion of the gratuity and does not 'take' any portion of the tip intended for services by the barista or baristas."

*Id*. at 697, 699, 703.

Since the Court of Appeals' decision, the other copycat lawsuits have been resolved or substantially limited in Starbucks favor.  *See* D'Arrigo Decl. ¶ 5 (*Block* lawsuit was dismissed following a settlement with the named plaintiff—not the putative class—after Starbucks noted that Pennsylvania has no statute addressing tips); *id.* ¶ 6 (after the plaintiffs abandoned their theory that shift supervisors should be excluded from tip distribution, the court in *Delsing* denied the plaintiffs' motion for class certification and granted Starbucks motion for summary judgment in part); *In re Starbucks Employee Gratuity Litig.*, 2009 WL 4884163, at *5 (the court denied plaintiffs' motion for class certification and granted the company's motion for summary judgment, finding that shift supervisors lawfully shared in the tips they collectively earned with baristas).

IV.     **ARGUMENT**

Summary judgment is proper "if the pleadings, the discovery and disclosures materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Where a non-moving party bears the burden of proof as to the claims at issue and "fails to make a showing sufficient to establish the existence of an element essential to that party's case," summary judgment is warranted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Thomas v. Digital Equip. Corp.*, 880 F.2d 1486, 1489 (1st Cir. 1989). Further, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

Summary judgment is warranted here because, based on the undisputed facts, plaintiffs cannot prove that their shift supervisor co-workers unlawfully received the tips they earned.

A.      **Plaintiffs' Statutory Claims Fail as a Matter of Law.**

Plaintiffs claim that Starbucks violated the Massachusetts tip statute, Mass. Gen. Laws ch. 149, § 152A, by permitting shift supervisors to receive tips, by distributing tips on a weekly basis, and by excluding certain training time from the tip distribution. As shown below, each of these claims fails as a matter of law.

1.      Plaintiffs' Claim That Shift Supervisors May Not Receive Tips Fails.

The tip statute is intended "to ensure that service employees receive the tips, gratuities, and service charges that customers intend them to receive." *DiFiore v. Am. Airlines, Inc.*, 454 Mass. 486, 490 (2009). The statute provides, in relevant part, that an employer may not (1) "demand, request or accept from any wait staff employee, service employee, or service bartender any payment or deduction from a tip or service charge given to such wait staff employee, service

employee, or service bartender by a patron;" or (2) permit such an employee "to participate in a tip pool through which such employee remits any [] tip . . .  for distribution to any person who is not a wait staff employee, service employee, or service bartender . . . ."  Mass. Gen. Laws ch. 149, § 152A(b)-(c).  Plaintiffs contend that they, as baristas, were tip-eligible employees—*e.g.*, "wait staff employees"—and that the shift supervisors were not.  Accordingly, by permitting the shift supervisors to receive a portion of the tips placed in the containers, Starbucks allegedly demanded "payment or deduction from a tip . . . given to such wait staff employee . . . by a patron," or forced plaintiffs to "remit" such tips to ineligible employees.

This claim fails for two independent reasons.  First, plaintiffs cannot show that the shift supervisors received money *given to plaintiffs* by a patron, which is all that the statute prohibits.  Simply put, the statute creates no right for "wait staff employees" to tips left for the service provided by *other* customer service employees.  Second, plaintiffs' claim fails regardless because, based on the undisputed facts, the shift supervisors were themselves "wait staff employees" and thus properly included in the tip distribution.[2]

a.     Plaintiffs Were Not Denied Any "Tips."

Plaintiffs' claim fails irrespective of whether the shift supervisors were "wait staff employees" because plaintiffs have not been denied any tips given for the service *they* provided, which is all the statute regulates.  The statute explicitly defines a "tip" as money "*given as an acknowledgment of any service performed by a wait staff employee, service employee, or service*

---

[2] Starbucks collective tip container is not a "tip pool."  As explained in *Chau*, a tip-pooling arrangement exists where "an employee is compelled to place his or her personal tips (or a portion of the tips) into a 'pool' to be shared with other employees."  *Chau*, 174 Cal. App. 4th at 703.  Starbucks, by contrast, "does not have a policy requiring baristas to give their tips to a shift supervisor."  *Id.* (emphasis omitted).  But regardless, the defenses described above apply whether or not plaintiffs rely on the "tip pool" portion of the statute.

*bartender*."  Mass. Gen. Laws ch. 149, § 152A(a) (emphasis added); *see also* Mass. Gen. Laws ch. 149, § 152A(b) (prohibiting employers from "demand[ing], request[ing] or accept[ing] from any wait staff employee . . . any payment or deduction from a *tip . . . given to such wait staff employee . . . by a patron*.")  (emphasis added).  Accordingly, to prove a violation, plaintiffs must do more than show that they were "wait staff employee[s], service employee[s], or service bartender[s]" and that the shift supervisors were not.  They also must prove that the tips those shift supervisors received were, in fact, "given as an acknowledgment of any service performed by" plaintiffs.  Simply put, plaintiffs must show that the shift supervisors took tips that *plaintiffs* earned.  Nothing in the statute entitles a wait staff employee to tips given for the service provided by someone else.

The factual record precludes a showing that shift supervisors took any tips "given as an acknowledgement of any service performed" by plaintiffs.  Indeed, the assertion that tips placed by customers in collective containers were actually given only to plaintiffs—or only to baristas— is insupportable.  This is true because, as the California Court of Appeal found in *Chau*, "[e]ach Starbucks customer is served by a customer service 'team,' rather than by an individual employee;" "[t]he team consists of one or more baristas and one or more shift supervisors;" and "[i]t is undisputed (and certainly the only reasonable conclusion) that by placing a tip in a *collective* tip box, the customer understands that this gratuity will be shared by all the service employees—baristas and shift supervisors."  *Chau*, 174 Cal. App. 4th at 692, 704.

Plaintiffs concede that their shift supervisor co-workers contributed to the customer service that generated the tips.  (UF ¶ 16.)  Thus, while they claim that baristas should get *all* of the tips, regardless of who earned them, they cannot seriously contend that all of the tips were "given as an acknowledgement of any service performed" by them.  *See Chau*, 174 Cal. App. 4th

at 706 ("There is nothing remarkable in concluding, and it follows logically, that the tips were intended for those who provided service.  To suggest otherwise ignores reality, something the law does not require.").

Indeed, the record precludes a showing that plaintiffs' shift supervisor co-workers received *any* tips "given as an acknowledgement of any service performed" by plaintiffs. Plaintiffs admit that they do not know whether any tips left in the containers were actually intended for them.  (UF ¶ 16.)  Nor could plaintiffs prove that they earned a greater portion of the tips by performing more of the customer service, given that the two jobs were virtually indistinguishable.  (*Id.*); *see also Chau*, 174 Cal. App. 4th at 692 ("Shift supervisors generally spend more than 90 percent of their time performing the same service tasks as do the baristas.").

In short, the record evidence precludes a finding that shift supervisors received any money "given as an acknowledgement of any service performed" by plaintiffs.  Rather, "[i]n this situation, the shift supervisor keeps only his or her earned portion of the gratuity and does not 'take' any portion of the tip intended for services by the barista or baristas."  *Id.* at 698; *see also id.* at 699 (Starbucks policy ensures "that each service employee receives the amount he or she is due").  Because the statute only applies to amounts given to customer service employees—and creates no right for those employees in tips given to others—plaintiffs' claim must fail, regardless of whether the shift supervisors in their stores were "wait staff employees."

        b.      <u>The Shift Supervisors Were "Wait Staff" Employees.</u>

Section 152A defines "wait staff employee" as:

> [A] person, including a waiter, waitress, bus person, and counter staff, who: (1) serves beverages or prepared food directly to patrons, or who clears patrons' tables; (2) works in a restaurant, banquet facility, or other place where prepared food or beverages are served; and (3) who has no managerial responsibility.

Mass. Gen. Laws ch. 149, § 152A(a).  Plaintiffs concede, as they must, that the shift supervisors in their stores worked in a "place where prepared food or beverages are served" and "serve[d] beverages or prepared food directly to patrons."  (UF ¶ 4.)  In fact, it is undisputed that the shift supervisors spent almost all of their work time performing the very same duties as baristas, including taking customer orders, operating the cash register, and making and serving drinks. (*Id.* ¶ 8.)  Plaintiffs' only argument that the shift supervisors were not "wait staff employees," therefore, is that they had "managerial responsibility."  This argument is not supported by either the facts or the law.

While the statute does not define "managerial responsibility," it makes clear that management and mere supervision are not one and the same.  Thus, the statute defines an "employer" as including "any person whose primary responsibility is the *management or supervision* of wait staff employees . . . ."  Mass. Gen. Laws ch. 149, § 152A(a) (emphasis added).  If management and mere supervision were synonomous, the latter term would be superfluous, contrary to fundamental principles of statutory interpretation.  *See Boone v. Commerce Ins. Co.*, 451 Mass. 192, 196 (2008) ("'every word in a statute should be given meaning' and no word is considered superfluous.").[3]  "Supervision" thus does not equate to "management" under the statute.

---

[3] Other statutes and rules likewise distinguish "managerial responsibility" from mere supervision.  For example, in defining employees as "managerial," the Massachusetts Public Employee Collective Bargaining Statute asks whether they participate to a substantial degree in formulating or determining policy.  Mass. Gen. Laws ch. 150E, § 1.  Similarly, the term "managerial responsibility" as used in the Massachusetts Rules of Professional Conduct has been interpreted as being distinct from mere "supervisory power:"  "[N]ot all employees with some supervisory power over their co-workers are deemed to have 'managerial' responsibility in the sense intended by the comment."  *Messing, Rudavsky & Weliky, P.C. v. President & Fellows of Harvard College*, 436 Mass. 347, 361 (2002).

The statute's purpose confirms that the Legislature did not intend to preclude customer service workers with, at most, minimal supervisory duties from receiving the tips they earned. *See DiFiore*, 454 Mass. at 490 ("[w]here the meaning of a statute is not plain from its language . . . [w]e look to the intent of the Legislature 'ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment . . . .").

> The Legislature's intent in enacting the Act can be plainly discerned from its language and history—to ensure that service employees receive the tips, gratuities, and service charges that customers intend them to receive.

*Id.* This purpose would be thwarted by denying tips to customer service workers, like shift supervisors, who plainly earned them. The statute cannot be interpreted in a way that undermines its express purpose. *See* Mass. Gen. Laws ch. 149, § 152A(a) (defined terms, including "wait staff employee," shall have proscribed meanings "unless a different meaning is required by the context . . . ."); *DiFiore*, 454 Mass. at 493-494 ("The Legislature, however, made clear in § 152A(a) that it wished the definitions it enacted to serve its legislative purpose, not thwart it, and invited courts to revise the definitions if they interfered with that legislative purpose.").[4]

---

[4] The Legislature is currently considering a bill, designed to clarify the tip statute, that confirms that the statute should not be read as precluding customer service workers who have none of the power of a true "manager" from receiving the tips they earn. *See Com. v. Shea*, No. 07-P-889, 2008 WL 927972, at *2 (Mass. App. Ct. Apr. 8, 2008) (relying on proposed bills and pending legislation to determine intent of current statute). The bill, which would be retroactive to 2004, provides that "an employee shall be considered to have managerial responsibility if said employee" satisfies several requirements, including that he or she (1) "has management as the primary duty of the position in a capacity greater than mere supervision," (2) is paid a wage or salary equal to at least two times the minimum wage, and (3) "has the direct authority to hire and fire without additional approval." Massachusetts House Bill No. 4324 (proposed Sept. 17, 2009) (attached as Exhibit A to D'Arrigo Decl.).

Other relevant guidance reinforces an interpretation of "managerial responsibility" that requires a degree of authority far greater than what the shift supervisors possess.  For example, the Massachusetts Attorney General recommends consideration of the "executive" exemption to the federal Fair Labor Standards Act ("FLSA").  *See* Advisory 2004/3, *An Advisory from the Attorney General's Fair Labor and Business Practices Division on an Act Protecting the Wages and Tips of Certain Employees* ("Attorney General Advisory") (attached as Exhibit B to D'Arrigo Decl.), Section I.A.1 n.3.  ("The Attorney General will look to 29 C.F.R. 541.1 (defining the term executive) and relevant law for interpretive guidance to define the term 'managerial responsibility.'"); *see also Mouiny v. Commonwealth Flats Dev. Corp.*, No. 06-1115-BLS1, 2008 WL 6151486 (Mass. Super. Ct. Aug. 18, 2008).[5]  Under this analysis, courts consistently hold that employees with far more authority than shift supervisors do not qualify as managers who are exempt from the FLSA's overtime requirements.  *See, e.g., Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1246-1258 and 1265-1273 (11th Cir. 2008) (upholding jury verdict that store managers who spent majority of time on "non-managerial" tasks were not exempt managers, even though their duties included interviewing and recommending employees for hire; training, scheduling and directing work of employees; maintaining production and sales

---

[5] Although the *Mouiny* decision's reliance on the FLSA standard is instructive, that decision's application of the law to the facts is of limited value because the court did not actually decide whether the employees at issue—"banquet captains"—were "wait staff employees." Rather, the court denied both parties' summary judgment motions, finding a factual dispute as to whether the banquet captains had "managerial responsibility."  *See Mouiny*, 2008 WL 6151486. Moreover, the banquet captains are easily distinguished from shift supervisors: the captains were responsible for "supervising and assisting up to 40 servers;" they only "occasionally 'engaged in the service of food or beverage;'" they wore different uniforms than the banquet servers; they carried radios to communicate with other staff, while the servers did not; and they "had access to computers and areas that were inaccessible to servers." *Id*.  In fact, one plaintiff testified that the captains spent their time merely "walking with [a] walkie-talkie" and telling the servers what to do, rather than serving customers. *Id*.

records; completing bank deposits; controlling petty cash and monitoring payroll budget);

*Jackson v. Go-Tane Servs. Inc.*, 56 Fed. App'x 267, 271 (7th Cir. 2003) (car wash manager was

not exempt manager, even though he trained and disciplined employees and made hiring, firing,

and pay recommendations); *Dye v. Family Market, Inc.*, No. 81-1331, 1982 WL 19205, at *5

(10th Cir. Feb. 22, 1982) (grocery store bakery manager was not exempt manager, even though

he was responsible for supervising full-time employees, ordering supplies and materials,

reviewing employee performance, and making hiring and firing recommendations); *Cowan v.*

*Treetop Enterprises, Inc.*, 120 F. Supp. 2d 672, 678-679 (M.D. Tenn. 1999) (unit managers at

franchise restaurants who spent majority of time stocking, cooking and serving were not exempt

managers, even though they also created schedules, maintained payroll, recommend

advancement of employees, and shared ability to hire, fire, and discipline employees with the

district manager); *Goodrow v. Lane Bryant*, 432 Mass. 165, 173 (2000) (employing FLSA as

interpretive guidance for Massachusetts state law overtime claim to determine co-sales manager

with no authority to hire, fire, promote or demote other employees did not have "managerial

responsibility" even though she provided guidance to other employees, opened and closed the

store and performed cash handling tasks).

The Attorney General Advisory, while not binding, is consistent with this authority.  It

explains that "[m]anagerial responsibilities *can* include supervising banquet events, making or

influencing employment decisions, scheduling shifts or work hours of employees, supervising

employees and assigning servers to their posts."  Attorney General Advisory § I.A.1 (emphasis

added).  These facts are not present here.  There is no dispute that the shift supervisors in

plaintiffs' stores did not supervise banquets; make or influence hiring, evaluation, transfer,

promotion, pay and firing decisions; schedule work hours; or possess any meaningful

supervisory authority whatsoever, in that they had no power to enforce even the most trivial request—whether through termination, evaluation, pay, discipline or even scheduling.  (UF ¶ 12.) All of these duties were the responsibility of the managers.  (*Id.* ¶ 6.)

While the shift supervisors played a role in deploying partners—including themselves— to the various work stations, baristas often assigned themselves to stations with no input from a shift supervisor whatsoever, and from there, they rotated positions throughout the shift.  (UF ¶ 7.) There is no authority suggesting that the ability to ask baristas to work at a station—with no power to enforce that request—by itself constitutes "managerial responsibility" sufficient to preclude a customer service worker from keeping the tips he earned.  Indeed, it would be contrary to the Legislature's intent to find that employees who spend nearly all their time on customer service must be excluded from receiving tips solely because they "assign servers to their posts."  *See DiFiore*, 454 Mass. at 491 (the statute's definitions must be applied in context to serve the Legislature's purpose, which is "to ensure that service employees receive the tips, gratuities, and service charges that customers intend them to receive.").

The Southern District of New York recently rejected the same claim under a similar standard.  The court first found that, as here, "Shift Supervisors do not have the authority to interview, hire, transfer, evaluate, promote, issue formal discipline, fire, or determine pay for any partners," and that they "also do not prepare the work schedule, approve overtime work, or process payroll."  *In re Starbucks Employee Gratuity Litig.*, 2009 WL 4884163, at *2.  Based on these facts, the court concluded that the shift supervisors were not Starbucks "agents," a term broadly defined as including "a *manager*, superintendent, foreman [and] *supervisor*."  *Id.* at **4-5 (emphasis added); *see also Starbucks Corp. d/b/a Starbucks Coffee Co. Store 7356 and Indus. Workers of the World IU/660*, Case No. 2-RC-22852, Decision at 21-22 (June 30, 2004) (attached

as Exhibit C to D'Arrigo Decl.) (the National Labor Relations Board's Regional Director for Region 2 held that shift supervisors in New York did not possess sufficient authority to render them "supervisors" under the National Labor Relations Act); 29 U.S.C. § 152(11) (defining "supervisor" to include:  "any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibility to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.")

The shift supervisors with whom plaintiffs worked, like those in New York, are not "managers" in any sense.  Indeed, no court has found that hourly customer service employees without authority to hire, fire, schedule, evaluate, or discipline other employees are precluded under Massachusetts law from receiving the tips they earned.  To do so would corrupt the statute's purpose, which is to ensure that tips go to the customer service workers who earned them.  That is precisely what occurred in plaintiffs' stores.  Because the shift supervisors in plaintiffs' stores had no "managerial authority" that could disqualify them as "wait staff employees," they were entitled to the tips they earned.  Accordingly, for this reason as well, plaintiffs' claim fails as a matter of law.[6]

---

[6] The shift supervisors in plaintiffs' stores also were "service bartenders"—another type of customer service worker who can receive tips—at least some of the time.  A service bartender is a person "who prepares alcoholic or nonalcoholic beverages for patrons to be served by another employee."  Mass. Gen. Laws ch. 149, § 152A(a).

2.      Chan's and Petersen's "Training" Claims Fail.

Plaintiffs claim that "Starbucks does not distribute tips to baristas during their training period," in violation of the tip statute.  (Third Am. Compl. ¶¶ 11.)  This claim fails as a matter of law as to both Petersen and Chan.

Petersen's claim fails because she admittedly never participated in training in Massachusetts.  (UF ¶ 18.)  Accordingly, she cannot prove, as she must, that Starbucks violated Massachusetts law by denying her tips during training.

Chan's claim fails because it is time-barred.  Chan's statutory claim is governed by a three-year limitations period, and her common law claims are governed by, at most, a six-year period.  Mass. Gen. Laws ch. 149, § 150 (2009) (plaintiff asserting violation of tip statute "may . . . within 3 years after the violation, institute and prosecute . . . a civil action."); Mass. Gen. Laws ch. 260, § 2 (2009) ("[a]ctions of contract . . . shall, except as otherwise provided, be commenced only within six years next after the cause of action accrues."); Mass. Gen. Laws ch. 260, § 2A (2009) ("actions of tort . . . shall be commenced only within three years next after the cause of action accrues.").  Chan last participated in training in 2001 (UF ¶ 18) but did not commence this action until 2008, more than six years later.  Because she did not commence this action within six years of when her claim accrued, all of her claims based on the alleged denial of tips during training are time-barred.

3.      Plaintiffs' Weekly Distribution Claim Fails.

Plaintiffs claim that Starbucks violated Massachusetts law by distributing tips "on a weekly basis."  (Third Am. Compl. ¶¶ 12-13.)  This claim fails for two reasons.

*First*, the tip statute does not regulate when tips collected in a communal container must be distributed.  Rather, its timing provision applies only to tips given "to an employer":  "Any

. . . tip remitted by a patron or person *to an employer* shall be paid to the wait staff employee, service employee, or service bartender by the end of the same business day, and in no case later than the time set forth for timely payment of wages under section 148." Mass. Gen. Laws ch. 149, § 152A(e) (emphasis added). Because tips in plaintiffs' stores were deposited in a collective container and then distributed by and among baristas and shift supervisors (UF ¶ 14), they were not "remitted. . . . to an employer," and thus the timing provision does not apply.

*Second*, even if the timing provision applied, it would be satisfied. Section 152A(e) requires that tips be distributed "the same business day, *and in no case later than the time set forth . . . under section 148*." Mass. Gen. Laws ch. 149, § 152A(e) (emphasis added). Section 148, the Payment of Wages Statute, requires employees employed for five or six days of a calendar week to be paid weekly or biweekly "within six days of the termination of the pay period during which the wages were earned," while employees who work less than five days must be paid within seven days of the termination of the work period during which the wages are earned. In short, tips are timely distributed if the distribution occurs within seven days of the end of the work period in which they were earned.

That is precisely what occurred in plaintiffs' stores. Starbucks policy provides that tips should be distributed weekly. (*See* UF ¶ 15.) Consistent with the policy, Petersen testified that, in her store, tips were distributed at the end of the week in which they were earned. (*See id.*) Matamoros, who was employed by Starbucks for only a week and a half, likewise testified that tips were distributed on a weekly basis. (*Id.*) Chan, too, admitted that tips typically were distributed weekly in her store, and she has no knowledge of the timing of distribution when she was not present. (*See id.*) ("if I didn't receive [my tips] [] Friday or [] Saturday, typically the next Saturday it would be ready, but I don't know whether it was done . . . earlier in the week.").

Because plaintiffs received tips within seven days of the end of the work period in which they earned them, their claim concerning the timing of the distribution fails as a matter of law.

**B.** **Plaintiffs' Common Law Claims Fail As A Matter of Law.**

In addition to their statutory claims, plaintiffs assert several common law claims—breach of contract, intentional interference with contractual and/or advantageous relations, and unjust enrichment/*quantum meruit*—based on the distribution of tips in their stores.  These claims are superseded by the tip statute claims and should be rejected on that basis:

> [W]here a statute has been enacted seemingly intended to cover the whole subject to which it relates, including a remedy for its infraction, other provisions of the common law, including such as are remedial in nature, are thereby superseded.

*Mouiny,* 2008 WL 6151486 (quoting *Sch. Comm. of Lowell v. Mayor*, 265 Mass. 353, 356 (1928)).  Thus, the *Mouiny* court dismissed all of the plaintiffs' common law claims where it was clear that "[i]f [the plaintiffs] fail to prevail on their Tips Act claim, they will be unable to prevail on their common law claims.  In short, the plaintiffs' case rises or falls on their Tips Act claim, and the common law claims are mere surplusage, of no legal consequence."  *Id.*; *see also Calcagno v. High Country Investor, Inc.*, No. 2003-0707C, 2004 WL 5301801 (Mass. Super. Ct. Aug. 10, 2004) (holding plaintiffs' claims for breach of implied contract and unjust enrichment barred because they are "dependent upon the [failed] premise that the Defendant violated [the Massachusetts Tips Law]"); *Alder Food Distribs. Inc. v. Keating*, No. 0000748, 2000 WL 33170823, at *9 (Mass. Super. Ct. June 6, 2000).

As in *Mouiny*, plaintiffs' common law claims are based on the same allegations as their tips statute claims and, therefore, they "rise and fall" together.  Accordingly, the common law claims are superseded and should be dismissed.  But regardless, as shown below, plaintiffs' common law claims fail in any event.

1.      Plaintiffs' Breach of Contract Claims Fail.

Plaintiffs contend that Starbucks breached an implied contract with respect to the tip distribution.  To prevail on this claim, a plaintiff must demonstrate that he conferred a measurable benefit on the defendant; the defendant accepted the services with the expectation of compensating the plaintiff; and the plaintiffs provided the services with the *reasonable expectation* of receiving compensation.  *See Bolen v. Paragon Plastics, Inc.*, 747 F. Supp. 103, 106 (D. Mass. 1990).

Thus, to prove their claim here, plaintiffs must show that they *reasonably expected* to receive more in tips than they actually did.  Their own testimony precludes that showing. Nobody ever promised plaintiffs any specific amount of tips.  (UF ¶ 17.)  Rather, as shown above, Starbucks policy provided—and plaintiffs understood—that baristas and shift supervisors, alike, would receive a portion of the tips based on their hours worked.  (UF ¶ 15.)  That is precisely what occurred.  (*Id*.)  In short, plaintiffs had no expectation whatsoever—let alone a "reasonable" one—that they would receive any greater portion of the tips than they did.  Their implied contract claim, therefore, fails as a matter of law.  *See, e.g., Jako v. Pilling Co.*, 848 F.2d 318, 320 (1st Cir. 1988) ("[t]he conduct of the parties . . . showed no basis to find a contract implied in fact" because there was no "reasonable expectation" to receive compensation); *Capital Assocs. v. Globe Newspaper Co., Inc.*, No. 2004-1930-C, 2007 WL 2080511, at *3 (Mass. Super. Ct. Apr. 30, 2007) (where the plaintiff continued to be compensated in the same form, even if an implied contract existed, there could be no breach).

2.      Plaintiffs' Intentional Interference Claims Fail.

Plaintiffs apparently contend that Starbucks interfered with a "business relationship" between them and the customers who deposited tips in the collective tip containers.  To prove

this claim, plaintiffs must establish, among other things, an intentional improper interference by Starbucks and a "loss of advantage" resulting from Starbucks conduct. *See, e.g., Galdauckas v. Interstate Hotels Corp, No 16*, 901 F. Supp. 454, 466 (D. Mass. 1995). Plaintiffs cannot satisfy either of these elements.

*First*, the undisputed facts preclude a finding that Starbucks improperly interfered with the relationship between plaintiffs and the customers they served. This element of the claim requires "improper motive or means" beyond the interference itself. *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 817 n.10 (1990). Thus, a plaintiff "'must not only prove that defendant intentionally interfered with his business relationship'" but "'that he interfered for an improper purpose *rather than for a legitimate one . . . .*'" *Id.* at 817 n.8 (considering whether the defendant "used threats, misrepresented any facts, defamed anyone, or used any other improper means in relation to . . . the existing contract" and whether his motive was to "hurt" plaintiff or simply to "benefit his customers and himself financially.") (emphasis added) (citing *Straube v. Larson*, 600 P.2d 371, 374 (1979)); *see also Kleinerman v. Applied Fiberoptics, Inc.*, No. 982804, 2001 WL 1811968, at *6 (Mass. Super. Ct. Dec. 20, 2001) (claim failed absent evidence that defendant's action was based on improper motive rather than legitimate business decision). Plaintiffs can prove no improper motive here, given that Starbucks policy merely ensures a fair and equitable distribution of tips among the company's hourly customer service employees. *Chau*, 174 Cal. App. 4th at 705.

*Second*, plaintiffs cannot prove that they suffered a "loss of advantage" due to Starbucks conduct, as they must. Specifically, plaintiffs must show that they suffered a pecuniary loss due to Starbucks policy. *See Ratner v. Noble*, 35 Mass. App. Ct. 137, 138 (1993) (finding trial court erred in submitting intentional interference count to jury where plaintiff did not demonstrate

actual pecuniary loss resulting from the interference); *see also Lynch v. City of Boston*, 180 F.3d 1, 19 (D. Mass. 1999).  As shown above, plaintiffs cannot prove that they received any less in tips than they actually earned.  For this reason as well, their claim fails.  *See, e.g., Morochnick v. Quigley*, 17 Mass. App. Ct. 1035, 1035 (1984) (reversing trial court judgment for plaintiff because plaintiff did not show actual damage).

3.      Plaintiffs' Unjust Enrichment/*Quantum Meruit* Claims Fail.

*Quantum meruit* is a theory of recovery, not a separate cause of action.  *See J.A. Sullivan Corp. v. Commonwealth*, 397 Mass. 789, 793 (1986).  In the absence of a contract, courts may permit *quantum meruit* recovery on the theory of unjust enrichment.  *See Woodrow Blitman Constr. Corp. v. Southfield Gardens Co.*, 534 F. Supp. 340, 347 (D. Mass. 1982).  The elements of this theory are the same as those of a claim for breach of an implied contract, including that the plaintiff reasonably expected the additional compensation at issue.  *See e.g., Bolen*, 747 F. Supp. at 106.  Because plaintiffs' implied contract claim fails, so too does their *quantum meruit* claim.

**V.**      **CONCLUSION**

For the foregoing reasons, Starbucks respectfully requests that its motion be granted.

Respectfully submitted,

DATED: March 25, 2010      /s/ Jessica W.P. D'Arrigo
      Robert M. Hale (BBO #217170)
      James C. Rehnquist (BBO #552602)
      Elianna J. Nuzum (BBO # 663354)
      GOODWIN PROCTER LLP
      Exchange Place
      53 State Street
      Boston, MA 02109
      (617) 570-1000
      jrehnquist@goodwinprocter.com
      enuzum@goodwinprocter.com
      rhale@goodwinprocter.com

Gregory W. Knopp
AKIN GUMP STRAUSS HAUER & FELD LLP
2029 Century Park East, Suite 2400
Los Angeles, CA 90067
Telephone: (310) 552-6436
Facsimile: (310) 229-1001
gknopp@akingump.com

Daniel L. Nash
Nathan J. Oleson
Jessica W.P. D'Arrigo
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Avenue
Washington, DC 20036
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
dnash@akingump.com
noleson@akingump.com
jdarrigo@akingump.com

ATTORNEYS FOR DEFENDANT
STARBUCKS CORPORATION

## CERTIFICATE OF SERVICE

I, Jessica W.P. D'Arrigo, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on March 25, 2010.

/s/ Jessica W.P. D'Arrigo