UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| HERNAN MATAMOROS, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 08-10772-NMG |
| STARBUCKS CORP., | ) ) ) | |
| Defendant. | ) ) | |

REPORT AND RECOMMENDATION ON
CROSS MOTIONS FOR SUMMARY JUDGMENT

February 8, 2011

SOROKIN, M.J.

Currently pending are the Parties' Cross Motions for Summary Judgment. Pursuant to an Order of Reference dated September 17, 2010, I RECOMMEND that the Plaintiffs' Motion for Partial Summary Judgment be ALLOWED, and that the Defendant's Motion for Summary Judgment be ALLOWED IN PART and DENIED IN PART.

The Plaintiffs' Second Amended Complaint is a purported class action (on behalf of all individuals who have worked for the Defendant, Starbucks Corporation, as baristas in Massachusetts, over the preceding six years) challenging Starbucks' policy of distributing customer tips to shift supervisors as well as wait staff. Docket # 10 at ¶ 1. Although the Plaintiffs (each of whom worked as a barista) also advance various common law claims, the primary dispute between the Parties (advanced in Count I of the Second Amended Complaint) is the Plaintiffs' assertion that Starbucks' tip sharing policy violates the Massachusetts Tips Law,

1

Mass. Gen. L. c. 149 § 152A. Id. The Plaintiffs' motion appears to seek judgment as a matter of law only with regard to Count I.[1] Moreover, the Plaintiffs have failed to oppose, or to otherwise address, that portion of Starbucks' motion for summary judgment which asserts that it is entitled to judgment as a matter of law on the remaining common law claims. Accordingly, I RECOMMEND that the Court ALLOW Starbucks' Motion with regard to Counts II, III and IV of the Second Amended Complaint.[2]

## I. FACTUAL BACKGROUND

The Parties are generally in agreement as to the underlying facts. Starbucks operates approximately one hundred and fifty retail stores in Massachusetts, selling coffee and other products. Docket # 26 at ¶ 2.[3] Starbucks refers to its employees as "partners," and its partners fall into four categories: baristas, shift supervisors, assistant managers and store managers. Id. at ¶ 3. Each of the Plaintiffs worked as a barista within the three-year period preceding the filing of the lawsuit. Id. at ¶ 1. Baristas and shift supervisors are part-time, hourly-wage employees, while store managers are full-time, salaried employees. Docket # 40 at 32.

---

[1] Count II is for Quantum Meruit/Unjust Enrichment. Count III is for Breach of Implied Contract. Count IV is for Unlawful Interference With Contractual and/or Advantageous Relations.

[2] In this instance, I view the failure to address Starbucks' arguments as a form of failure to prosecute these claims. The Plaintiffs bear the burden of prosecuting their claims and of establishing in opposition to the Defendants' motion sufficient admissible evidence to permit a finder of fact to rule in their favor. The Plaintiffs have not attempted to bear that burden. Accordingly, I have not addressed that portion of Starbucks' motion that is unopposed. If the Court wishes me to do so, I will.

[3] Where Starbucks does not dispute a fact asserted by the Plaintiffs, the Court cites only to the Plaintiff's Rule 56 Statement of Undisputed Material Facts. Citations to the Defendant's Rule 56 Statement are to page numbers (because multiple paragraphs are assigned the same numbers within this document).

Among their duties, baristas help to create the "Starbucks Experience" for customers by providing prompt service, providing quality beverages and products, and by helping to maintain a clean and comfortable store environment. Docket # 26 at ¶ 6. Their duties include taking and fulfilling customer orders, operating the cash register, stocking products and cleaning the store. Id. at ¶ 7. Baristas must complete an initial two-week training program. Id. at ¶ 9.

Shift supervisors typically earn more than baristas (but, at the time a shift supervisor is hired, the difference in pay is typically less than $2 per hour). Docket # 40 at 8. New shift supervisors enter a training program that lasts between twenty-five and thirty hours. Docket # 26 at ¶ 16. Their training occurs both "in-store" and at an off-site training facility or regional office. Id. Their training includes general information on the shift supervisor role and on specific supervisory skills such as deployment and coaching. Id. at ¶ 17. "Deployment" means the placement of baristas and other partners at particular locations during a shift (e.g., on the cash register or at the espresso station). Id. at ¶ 18; Docket # 40 at ¶ 18. "Coaching" refers to the process by which partners provide feedback to other partners. Docket # 26 at ¶ 19.

Starbucks requires that every store always have either a shift supervisor, assistant manager or store manager on premises at all times. Docket # 26 at ¶ 20. In the absence of a manager or assistant manager, shift supervisors are responsible for opening the store's safe and pulling out cash register tills. Id. at ¶ 21. They also handle customer complaints and informally discuss hiring opportunities with job applicants, though these latter two responsibilities are non-exclusive -- that is, baristas may (and do) also perform these functions. Id.; Docket # 40 at ¶ 21.

Shift supervisors are also responsible for "running the shift" in the absence of a store manager or assistant store manager. Docket #40 at ¶ 15. Although a shift supervisor spends the "vast majority of his [or her] time – all but a half hour of each shift – serving customers and performing other barista tasks," Starbucks concedes that shift supervisors have additional responsibilities including "limited supervisory responsibilities" which are "often," but thus not always, "exercised according to specific instructions from a store manager or assistant manager." Docket # 40 at ¶ 22. The shift supervisor job description lists among the position's "job scope" that three to six partners are "directly managed" while on shift. Docket # 26-8 at 4.

The shift supervisor position description notes that shift supervisors are responsible for "direct[ing] partners to various workstations to avoid bottlenecks and to ensure speed of service" and that operational needs are met. Docket # 26-8 at 3. Although such deployment is one of the shift supervisors' additional responsibilities, it is not under the exclusive control of shift supervisors – it is "often" a collaborative effort and may be guided by a store manager's directives as well as by company or store practices. Id. For example, a shift supervisor may execute the store manager's directives regarding deployment by using a duty roster created by the store manager to deploy partners. Id. at ¶¶ 22, 23(a). Deployment by shift supervisors is often (and, therefore, not always) set by store managers in advance. Id. at ¶ 23(a). Deployment may also involve a shift supervisor executing Starbucks' general standards. Id.

Shift supervisors also remind partners to take breaks – often (but again, not always) in keeping with a schedule set by the store-manager, or according to a predetermined computerized schedule. Docket # 40 at ¶ 23(b) (Shift supervisors "typically" defer to the store manager's break schedule). However, the shift supervisors lack the actual authority to discipline or to enforce

4

their directives. Id. Both baristas and shift supervisors might arrange coverage when a partner cannot come in to work, or wishes to change shifts, and only a store manager can approve such a change. Id. at ¶ 23(e). Only a store manager may approve a change to a partner's schedule. Id. at 23(f).

Shift supervisors also handle and account for cash, changing out the tills in the cash registers, accessing the store's safe to make change, and bringing deposit slips to and from the bank. Docket # 26 at ¶ 23(c). Unlike baristas, shift supervisors have either a key or pass code which allows them to access the store's safe. Id. Starbucks notes that the amount of time which shift supervisors spend on these tasks is "minimal." Docket # 40 at ¶ 23(c). Similarly, shift supervisors possess a code to void sales transactions, which baristas do not possess (although the store manager bears the ultimate responsibility for voiding transactions). Docket # 40 at ¶ 23(j).

Shift supervisors open and close stores, but typically do so along with a barista. Id. at ¶ 23(c). However, unlike the baristas, the shift supervisors possess keys to the store and are able to disarm the store's alarm system. Docket # 26 at ¶ 23(d). The job description for shift supervisors states that their responsibilities include "organiz[ing] opening and closing duties, as assigned." Docket # 26-8 at 3. The job description of the barista makes no reference to opening and closing procedures. Docket # 26-6.

Both baristas and shift supervisors may provide "verbal corrective feedback," but neither may discipline other partners (in the sense that Starbucks defines discipline -- which is something recorded in a written corrective action form by a store manager or assistant store manager). Docket # 40 at ¶ 23(e).

A shift supervisor spends the vast majority of his or her time, up to ninety percent, performing functions which baristas also perform. Docket # 40 at 33. On those occasions where more than one shift supervisor is working at the same time, one of the shift supervisors works solely as a barista. Id. at 34. Shift supervisors (like baristas) cannot interview job applicants, hire or fire partners, discipline partners, or determine pay for partners. Id.

Open assistant store manager positions are filled approximately sixty to seventy percent of the time from the ranks of shift supervisors. Docket # 26 at ¶ 28. Baristas are not eligible to be promoted directly to the assistant manager position (that is, without first being employed as shift supervisors). Id. at ¶ 30.

Starbucks stores utilize tip jars placed next to the register, in which customers may leave money. Id. at ¶ 36. Once the jar is full, its contents are emptied into a bag labeled "tips" and that bag is placed in the store safe. Id. at ¶ 37. The contents are divided weekly among baristas and shift supervisors by dividing the total amount collected by the total number of qualifying hours worked that week by baristas and shift supervisors. Id. at ¶ 38; Docket # 40 at 35-36.

II.  DISCUSSION

   A.  Applicable Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rogan v. City of Boston, 267 F.3d 24, 26 (1st Cir.2001)(citing Fed. R. Civ. P. 56(c)). Once a party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who "may not rest on mere allegations or denials of his pleading, but must set

forth specific facts showing there is a genuine issue for trial." Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir.1995)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). Moreover, the Court is "obliged to view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." LeBlanc v. Great American Ins. Co., 6 F.3d 836, 841 (1st Cir.1993). Even so, the Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation." Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir.2009).

    B. The Massachusetts Tips Law

The Massachusetts Tips Law (M.G.L. c. 149, § 152A) provides the following definitions relevant to the pending motions. A "tip" is "a sum of money, including any amount designated by a credit card patron, a gift or a gratuity, given as an acknowledgment of any service performed by a wait staff employee, service employee,[4] or service bartender." M.G.L. c. 149, § 152A (a).

A "wait staff employee" is "a person, including a waiter, waitress, bus person, and counter staff, who: (1) serves beverages or prepared food directly to patrons, or who clears patrons' tables; (2) works in a restaurant, banquet facility, or other place where prepared food or beverages are served; and (3) who has no managerial responsibility." Id. (emphasis added).

The statute further provides in relevant part that:

> No employer or person shall cause, require or permit any wait staff employee . . . to participate in a tip pool through which such employee remits any wage, tip or service charge, or any portion thereof, for distribution to any person who is not a wait staff employee . . . An employer may administer a valid tip pool and may keep a record

---

[4] The definition of "service employee" excludes those working in the food and beverage industry, and so is not relevant to the Parties' dispute.

7

of the amounts received for bookkeeping or tax reporting purposes.

M.G.L. c. 149, § 152A(c).

Massachusetts Law Governing Statutory Construction

Under Massachusetts law, statutes are to be interpreted in accord with "the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." Champigny v. Commonwealth, 422 Mass. 249, 251 (1996) (quoting Commonwealth v. Galvin, 388 Mass. 326, 326-328 (1983)). "Courts must ascertain the intent of a statute from all its parts and from the subject matter to which it relates, and must interpret the statute so as to render the legislation effective, consonant with sound reason and common sense." DiGiacomo v. Metropolitan Property & Cas. Ins. Co., 66 Mass.App.Ct. 343, 346 (2006) (citing Champigny, 411 Mass at 251 (additional citations omitted)). However, "[w]here the ordinary meaning of the statutory terms yields a workable result, we need not resort to extrinsic aids of interpretation such as legislative history." Cooney v. Compass Group Foodservice, 69 Mass.App.Ct. 632, 640 (2007) (citing Pyle v. School Comm. of S. Hadley, 423 Mass. 283, 286 (1996)).

Massachusetts courts have also provided guidance concerning the construction of the Tips Law in particular. The Massachusetts Appeals Court has stated that in devising the Tips Law, the Legislature devised a type of "strict liability" in order to achieve its goal of "letting employees keep tips, gratuities, and fees called 'service charges,'" and that although absurd results are always to be avoided, courts must nevertheless read the statute literally so long as it produces a

result in conformity with evident legislative intent, even if "from time to time service employees may reap seemingly unfair benefits." Id. at 639. The Supreme Judicial Court noted that in enacting the 2004 amendment to the Tips Law, the Legislature "made clear in § 152A (a) that it wished the definitions it enacted to serve its legislative purpose, not thwart it." DiFiore v. American Airlines, Inc., 454 Mass. 486, 493 (2009). "[A]s expressly stated in its title, the purpose of the revised Act is to "protect the wages and tips of certain employees." Id. at 492.

Finally, the Supreme Judicial Court has instructed that an interpretation of the Tips Law by the Attorney General (who is charged with administering the Tips Law) is to be granted "substantial deference" and that the Supreme Judicial Court will not disturb his or her interpretation where the interpretation is reasonable. Id. at 496, n. 11.

Context of the 2004 Tips Law Amendment

The Tips Law was amended in 2004 in a manner relevant to the Parties' present dispute. Previous to the amendment, the statute provided in relevant part that,

> "No employer or other person shall solicit, demand, request or accept from any employee engaged in the serving of food or beverage any payment of any nature from tips or gratuities received by such employee during the course of his employment, or from wages earned by such employee or retain for himself any tips or gratuities given directly to the employer for the benefit of the employee, as a condition of employment . . . If an employer or other person submits a bill or invoice indicating a service charge, the total proceeds of such charge shall be remitted to the employees in proportion to the service provided by them."

St.1983, c. 343

In considering cases dealing with tip pools in the context of the previous statute, courts struggled to ascertain whether or not the Legislature intended to permit the sharing of service charges and/or tips with employees not primarily engaged in the service of food or beverages.

9

For example, in Williamson v. DT Management, Inc., 2004 WL 1050582 (Mass.Super.), the employer argued that the absence of the modifier "engaged in the serving of food and beverage" in the sentence relating to service charges (despite its use in the previous section, dealing with tips) suggested that although managerial employees could not share in tips, they could share in service charges. Id. at * 7. The Williamson court resolved the ambiguity about the meaning of the terms "employee" and "service" in the pre-amendment statute by concluding that it would be illogical to interpret the statute to protect the servers with regard to tip pooling, but not with regard to service charges. Id. at * 11.

In Fraser v. Pears, Inc., 2003 WL 21385384 (Mass.Super.), the Court concluded that the chief harm sought to be addressed by the Legislature was the potential for employer/owner appropriation of tips meant for employees. Id. at * 2. The Fraser court concluded that the statute permitted tip pooling with employees who had managerial responsibilities, but who also engaged in serving activities (such as the subject restaurant's maitre d'). Id. at * 3. In doing so, the Court declined to give deference to the contrary opinion of the Attorney General, and noted that the attorney general supported "clarifying legislation because owners and managers of restaurants did not appear to understand the law." Id.[5] ; See also Nedved v. 1760 Soc., Inc., 2004 WL 504800 (Mass.Super.) (banquet coordinators may lawfully share in service charges because the benefits of the statute were intended to flow to all employees, not just those engaged in serving food and drink).

---

[5] On this point, see also Docket # 25-6. (A representative of the Attorney General testifies that the proposed 2004 amendment "[p]rotects . . . business owners who employ workers who receive tips and who, most of all, need to know clearly which employees are entitled to share in tips and service charges and which are not").

Other courts, however, attempted to resolve the same ambiguities and reached the opposite result. See, Fernandez v. Four Seasons Hotels, Ltd., 2007 WL 2705723 (Mass.Super.) (tip pooling with managers prohibited despite service duties because their "primary duty" is supervision);[6] Michalak v. Boston Palm Corp., 2004 WL 2915452 (Mass.Super.) (same).

Against this backdrop, the Legislature's 2004 amendment to the Tips Law can only be understood as an attempt to remedy the confusion to which it had been alerted by the Attorney General. It explicitly defines who is ineligible to participate in a tip pool – namely, any person who is not "a wait staff employee," the definition of which clearly excludes persons with <u>any</u> managerial responsibility. See, supra at 7. The current version narrowed the scope of persons eligible to participate in tip pools. Formerly the law prohibiting pooling of tips from an "employee engaged in the serving of food or beverage," St. 1983, c. 343, while now the law prohibits an employer from sharing with any employee with any "managerial responsibility" tips given to wait staff employees. M.G.L. c. 149, § 152A(a).

The Attorney General (whose interpretation of the Tips Law is to be granted "substantial deference," see supra) has advised that "[w]orkers with limited managerial responsibility, such as shift supervisors, assistant managers, banquet captains and many maitre d's, do not qualify as wait staff employees" and thus cannot share tips. Docket # 29-2 at 2. "Managerial responsibilities can include supervising banquet events, making or influencing employment decisions, scheduling shifts or work hours of employees, supervising employees and assigning servers to their posts." Id. The Attorney General "will look to 29 C.F.R. 541.1

---

[6] While the court rendered this decision after the 2004 amendments, the ruling applies the pre-2004 amendment version of the law. Id. at *2. The court also opined that post-2004 amendments "reinforce[d]" the result it reached. Id.

(defining the term "executive") and relevant law for interpretive guidance to define the term 'managerial responsibility." Id. at n. 3. 7

Massachusetts courts have interpreted the amended statute in this light. For example, in DePina et al. v, Marriot International Inc., et al, a justice of the Superior Court in 2009 interpreted the amended statute to prohibit the pooling of tips with banquet captains who had some managerial responsibility. Docket # 25-3. The Court found that although "banquet captains" at the defendant hotel did not engage in the vast majority of functions considered to be managerial, it was nevertheless undisputed that "they directed the work of the servers and apportioned work among them" and at least part of their job involved supervising servers during banquets. "The New Act affords protection only to employees who have 'no managerial responsibility.' As supervisors, the captains had at least some managerial responsibility." Id. at 15.

Similarly, in Black v. Cranwell Management Corp., et al., a justice of the Superior Court found in 2009 that even where a defendant argued that an employee's managerial duties were "exceedingly slight," and her primary duties entailed performing spa duties rather than managerial tasks, the so-called "primary duty test" is no longer relevant under the amended Tips Law. "The Tips Act is unambiguous and does not distinguish between employees who have many managerial responsibilities and those who have few." Docket # 25-4 at 13-14.

---

7 Strictly applying the federal definition might result in determining that shift supervisors are not executives, however, the federal law and regulations are only, in the words of the Attorney General, "factors [that] may be relevant in determining whether a worker has managerial responsibility." Docket #29-2 at 3. The Attorney General's qualified citation in a footnote to the federal regulation neither renders the instant issue one of simply applying the federal definition nor does it transform the Attorney General's otherwise clear opinion that "[w]orkers with limited managerial responsibility, such as shift supervisors . . . do not qualify as wait staff employees." Moreover, the citation cannot alter the statute's text.

The Tips Law Applied To Starbucks' Shift Supervisors

Starbucks makes two primary arguments. First, it contends that shift supervisors bear no managerial responsibility and, therefore, they may share in tips as the Tips Law defines that term. This argument presents a narrow question: do Starbucks' shift supervisors have <u>any</u> managerial responsibilities? The undisputed evidence establishes that they do: Starbucks' shift supervisors have at least <u>some</u> managerial responsibilities, and thus are not "wait staff employees" as defined by the statute, and thus are prohibited by M.G.L. c. 149, § 152A(c) from participation in tip pools. The shift supervisors' job description lists among the position's "job scope" that three to six partners are "directly managed" while on shift. Docket # 26-8 at 4. That shift supervisors have at least some managerial responsibility is highlighted by Starbucks' requirement that every store always have either a shift supervisor, assistant manager or store manager on the premises at all times. Docket # 26 at ¶ 20. This Starbucks policy undermines its contention that it has not vested shift supervisors with any managerial responsibility.

In the absence of a manager or assistant manager, shift supervisors are responsible for opening the store's safe and pulling out cash register tills. <u>Id.</u> at ¶ 21. Shift supervisors also handle and account for cash, changing out the tills in the cash registers, accessing the store's safe to make change, and bringing deposit slips to and from the bank. Docket # 26 at ¶ 23(c). Unlike baristas, shift supervisors have either a key or pass code, which allows them to access the store's safe. <u>Id.</u>

Starbucks, in fact, concedes that the shift supervisors have responsibilities beyond those which baristas have, including "limited supervisory responsibilities" which are "often"– but thus not always – "exercised according to specific instructions from a store manager or assistant

13

manager." Docket # 40 at ¶ 22. The shift supervisor position description notes that shift supervisors are responsible for directing partners to various workstations to avoid bottlenecks and to insure speed of service and that operational needs are met. Docket # 26-8 at 3. Shift supervisors also remind partners to take breaks – often (but again, not always) in keeping with a schedule set by the store-manager, or according to a predetermined computerized schedule. Docket # 40 at ¶ 23(b). Shift supervisors open and close stores. Id. at ¶ 23(c). Unlike baristas, the shift supervisors possess keys to the store and are able to disarm the store's alarm system. Docket # 26 at ¶ 23(d). Although they typically perform opening and closing duties in the presence of a barista, the job description for shift supervisors lists "organiz[ing] opening and closing duties, as assigned" as among their responsibilities. Docket # 26-8 at 3.

The fact that shift supervisors spend as much as ninety percent of their time on tasks that are identical to baristas is immaterial. By its 2004 amendments, the Legislature explicitly repudiated the "primary duties" rubric previously employed by some Courts addressing this issue. Nor is it material that the shift supervisor does not have responsibility for most, or even, many of the traditional managerial tasks (such as hiring, firing, disciplining of partners). Under the plain language of the statute, an employee is not a "wait staff employee" if he or she has any managerial duties. The totality of all of the undisputed evidence, with all reasonable inferences drawn in Starbucks' favor, leaves only one conclusion – that shift supervisors possess some managerial responsibility. Indeed, Starbucks Rule 30(b)(6) deponent described a shift supervisor as "running the shift." See Docket # 26-5 at 18.

Alternatively, Starbucks contends that the money left by customers (or at least the portion distributed to shift supervisors) is not a "tip" within the meaning of the Tips Law. The

statute defines tips as monies "given as an acknowledgment of any service performed by a wait staff employee." M.G.L. c. 149, § 152A (a). Starbucks argues that customers are leaving the tip money for those persons that provided service to them – i.e., the baristas and shift supervisors since both work together as a team to serve Starbucks' customers. Or put another way, Starbucks asserts that the customer has given some portion of the money in order to acknowledge the shift supervisors' service to the customer. Reasoning that the shift supervisor is not a "wait staff employee" within the meaning of the Tips Law, supra, Starbucks contends that the money left in the jar (or at least the portion acknowledging the work of the shift supervisor) is therefore not a "tip" under the Tips Law. Not only is Starbucks' counsel's argument clever, but the argument has some practical merit on the facts of this case. The baristas and shift supervisors service functions overlap and to the customer, they may appear as identical employees both having served the beverage ordered by the customer.

The Plaintiffs counter by arguing that the Tips Law renders irrelevant the intent of the customer regarding a tip pool such as Starbucks' (See Cooney, 69 Mass.App.Ct. at 638, n. 6) and thus shift supervisors may not participate in the tip pool. The Court reaches the same result as the Plaintiffs, although by somewhat different reasoning.

The money left by an individual customer, whether a single coin or bill or several such items is, on the facts of this case, an indivisible reward to acknowledge service rendered by the Starbucks Team that served the customer. The Tips Law defines a "tip" as an acknowledgment of "any service" performed by wait staff employees. M.G.L. ch. 149, § 152A(a)(emphasis added). Because the money left by the customer recognizes service performed by the baristas, the money qualifies as a "tip" under the Tips Law. Plainly, Starbucks may not require baristas to share

"tips" with non-wait staff employees. See M.G.L. c. 149, § 152A(c) (providing that "[n]o employer or person shall cause, require or permit any wait staff employee . . . to participate in a tip pool through which such employee remits any wage, tip or service charge, or any portion thereof, for distribution to any person who is not a wait staff employee.") [8]

The Commonwealth's Courts have directed a literal reading of the statute so long as it produces a result in conformity with evident legislative intent, even if "from time to time service employees may reap seemingly unfair benefits." Cooney, 69 Mass.App.Ct. at 639. The foregoing result effectuates the Legislature's purpose, as expressed in the plain language of the statute – i.e., to protect wait staff employee's tips from pooling with employees with any managerial responsibility. The fairness of prohibiting an employee such as a Starbucks shift

---

[8] Even if the Court were to characterize the money left by the customer as two divisible portions – one portion recognizing the service of shift supervisors and the other portion recognizing the service of baristas – the result is the same. Under the facts of this case, the customer has not determined the appropriate division between the shift supervisors and the baristas. The Tips Law prohibits an employer such as Starbucks from distributing "tips" to non-wait staff employees. By distributing the money left by customers as it does, Starbucks has decided itself what is a "tip" (the money it redistributes to baristas) and what is not a "tip" (the money it redistributes to shift supervisors). This it cannot do and then contend plaintiffs have failed to establish that the division is incorrect. In construing the Tips Law regarding a "service charge" imposed at a banquet hall, the Massachusetts Appeals Court rejected the argument that the law places "the burden on service employees to prove in each instance that a particular 'service charge' was in fact intended by the employer or other person as a tip or gratuity." Cooney, 69 Mass.App.Ct. at 638-39. The Tips Law also walls off "tips" from employer control, M.G.L. c. 149, § 152A(c). To the extent that the money left by Starbucks customers has a dual or ambiguous quality, neither the purpose nor construction of the statute permit Starbucks to characterize these acknowledgments of service from customers as other than a "tip" for wait staff employees. Cf. Advisory 2004/3 from Attorney General at 3 (advising that "ambiguously described fees . . . are treated as service charges that must be remitted entirely to wait staff employees"); DiFiore, 454 Mass at 493 ("[t]he Legislature intended to ensure that service employees receive all the proceeds from service charges, and any interpretation of the definition of "service charge" must reflect that intent")

supervisor from participating in a tip pool, under the facts reflected in the record before the Court, is for the Legislature to decide.

Finally, the parties have pointed the Court to and argued about the significance of a California state court decision involving Starbucks. Chau v. Starbucks, 174 Cal.App.4th 688 (2009). The law applied by the California court differs materially from the Massachusetts Tip Law: the California law governed tips "left for an employee," id. at 691 & 698, and, it lacks the language present in the Massachusetts Tips Law defining wait staff employees and tips.

III.     CONCLUSION

For the foregoing reasons, I RECOMMEND that the Court ALLOW the Plaintiff's Partial Motion for Summary Judgment (Docket # 25) on Count I of the Second Amended Complaint, alleging violation of the Massachusetts Tips Law, M.G.L. c. 149 § 152A.[9]  I further RECOMMEND that the Defendant's Motion for Summary Judgment (Docket # 27) be DENIED as to Count I, and otherwise ALLOWED. [10]


       /s / Leo T. Sorokin
    UNITED STATES MAGISTRATE JUDGE

---

[9] As noted previously (see note 2, supra), the Plaintiffs have not prosecuted the claims in Counts II, III, and IV of the Second Amended Complaint, and the Court construes their Motion for Summary Judgment as seeking judgment as a matter of law only on Count I.

[10] The Parties are hereby advised that any party who objects to these proposed findings and recommendations must file a written objection thereto within 14 days of receipt of this Report and Recommendation.  The written objections must identify with specificity the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections.  See Fed. R. Civ. P. 72 and Habeas Corpus Rule 8(b).  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  See Keating v. Secretary of Health and Human Services, 848 F.2d 271 (1st Cir.1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4 (1st Cir.1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir.1980); United States v. Vega, 678 F.2d 376, 378-379 (1st Cir.1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir.1983); see also Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466 (1985).